## GREGORY AZIA *v.* PAULA DILASCIA
### (AC 20279)

Spear, Dranginis and Hennessy, Js.

Argued January 19—officially released July 31, 2001

*James H. Lee*, with whom, on the brief, was *Kirk A. Bennett*, for the appellant (defendant).

*Gaetano Ferro*, for the appellee (plaintiff).

*Renee Marie Houle*, with whom, on the brief, was *Patricia H. Modzelewski*, for the minor child.

*Opinion*

SPEAR, J. In this dissolution of marriage action, the defendant, Paula DiLascia, appeals from the trial court's judgment awarding primary physical custody of the parties' minor child to the plaintiff father, Gregory Azia. The defendant claims that in determining who should have primary physical custody of the minor child, the court improperly (1) failed to consider the preference

of the child, (2) failed to consider the *Ireland* factors[1] with respect to the defendant's relocating to New Jersey, (3) burdened her constitutional right to interstate travel, (4) found material facts without evidence to support them and (5) took judicial notice of ethical rules without giving notice to the parties. We affirm the judgment of the trial court.

The following facts and procedural history are relevant to this appeal. The parties were married in September, 1989. A child who was born on May 6, 1991. The plaintiff is a board certified general surgeon, who maintains a solo practice in New London. The defendant has advanced degrees in pharmacology and law.[2] During the marriage, the plaintiff attempted to persuade the defendant to work full-time in a pharmaceutical or legal career, but she chose not to do so. The defendant, instead, stayed home as a full-time mother and established a close bond with her child. When the child reached school age, the parties decided to send her to a private school where the defendant served as a volunteer several days a week. The child flourished and enjoyed the school both academically and socially.

In April, 1998, the defendant's mother was diagnosed with cancer. The defendant's mother lived in New Jersey, where the defendant was born and raised. In May, the plaintiff and the defendant agreed that the defendant and their daughter would go to New Jersey so that the defendant could care for her mother. The defendant enrolled the child in school in New Jersey for the child

---

[1] In *Ireland* v. *Ireland*, 246 Conn. 413, 429–32, 717 A.2d 676 (1998) (en banc), our Supreme Court enunciated the factors to be considered when a custodial parent wants to relocate.

[2] The defendant is licensed to practice law in Connecticut. Although her license as a pharmacist lapsed due to her failure to complete fifteen hours of continuing education, it could be renewed. During the marriage, she practiced as a pharmacist in Connecticut and, at some point, also functioned as the office manager of the plaintiff's medical practice.

to finish her last month of the school year. The plaintiff visited them in New Jersey on the weekends.

The separation exacerbated the strain that already had existed in the parties' marriage. When the defendant informed the plaintiff that she had enrolled their child for another school year in New Jersey, the plaintiff objected because the parties previously had reenrolled the child in her Connecticut school for the 1998-1999 school year. Thereafter, the plaintiff consulted counsel and decided to file for dissolution of marriage. The plaintiff also decided to keep the child with him in New London when she visited him for a holiday in September, 1998, and the child again began attending school in Connecticut. At the time of the trial, the defendant worked as a part-time office manager in New Jersey.

On October 16, 1998, the parties reached a comprehensive agreement, which the court approved. The agreement provided for joint legal and physical custody of the child, as well as the weekly, holiday and vacation visitation rights of each parent. The order contemplated that the child would remain in the New London area.[3] On November 5, 1998, the defendant filed a motion with the court to refer the case to family relations for a custody and visitation study. She sought sole physical custody of their child because she had decided to move to New Jersey.[4] The court granted the motion.

---

[3] The defendant maintains that she did not know that the agreement, which became the October 16, 1998 court order, was in any way permanent. The court concluded, and we agree, that by its very language the schedule was comprehensive for future years. It provided for specific visitation rights of each parent and even went so far as to address the child's telephone communications with each parent.

[4] The defendant reported that the reasons she moved to New Jersey were (1) to care for her mother, (2) to have family support through the divorce process and (3) to avail herself of possible economic opportunities there. The court found that the first reason was moot and that the last two were invalid.

The defendant asserts that there was family support in New Jersey that she did not have in Connecticut because her mother, father and brother were there. Her mother, however, had passed away, her relationship with

544

Both parents were evaluated by Robyne Diller, a psychologist who had administered a battery of tests and had conducted clinical interviews of each parent between September and December, 1998. In addition, the psychologist interviewed the child and observed her in separate interaction sessions with each parent. Diller's findings were believed to be valid and, therefore, useful to the court. Diller concluded that the plaintiff had social skills problems that were treatable in therapy. The plaintiff had sought therapy prior to filing for dissolution of marriage because he was concerned about his marital problems and his inability to see the child, who was then living in New Jersey. In 1998, the plaintiff attended therapy weekly, then once every other week, before he stopped for two to three months. In January, 1999, he commenced therapy again, which he attended two out of every three weeks up to the date of trial.

By contrast, Diller's findings with respect to the defendant were cause for concern by the court. Diller

her father was not developed for the court and her contact with her brother was infrequent. The court noted that the defendant had a sister in Westport, Connecticut, whom she saw infrequently.

The defendant asserts that her life in New Jersey would be happier for her and the child because she claims that there are more economic opportunities by way of employment for her there. The defendant, however, never investigated employment opportunities in Connecticut for herself in any meaningful way in the time before her separation from the plaintiff and never investigated them at all after the separation. The court noted that the defendant was in the enviable position of having the education to pursue three different career avenues for herself, namely, law, pharmaceutical, office management or a hybrid of these. Instead, she relied on an offer of employment from an uncle at an undefined job with undefined wages. She never properly explored the opportunities for herself that would not have resulted in a disruption of the child's life. The court concluded that all of the defendant's reasons were cloaked in her own needs.

The defendant also argued the merits of the activities available, the neighborhood and the beaches as reasons for the child's future happiness in New Jersey. The court gave this no weight because the Connecticut community had the same resources and advantages for raising the child.

concluded that the defendant had problems of enmeshment[5] with her daughter, which required immediate, intensive psychotherapy. The defendant did not seek counseling after receiving Diller's recommendation even though she had five months to do so.[6]

The defendant claimed that she could not afford psychotherapy. The court, however, found that if the defendant had been committed to psychotherapy, she had the financial means to do so by reallocating her discretionary spending and by increasing her work hours. The court further found that the defendant did not have a commitment to engage in psychotherapy to confront and to deal with the issues identified by Diller.

Without consulting the plaintiff, the defendant started the child in psychotherapy in November, 1998, with Patricia Hanley-Kallen, the special master psychologist from the Early Intervention Program that the family had participated in a month earlier.[7] Hanley-Kallen failed to consider the possible conflict of interest in treating the child after her position as a special master. After treating the child nine times in the course of a year, she recommended that the child live with the defendant based on the child's preference to live with her mother and the defendant's historical role in the child's life. The court accorded Hanley-Kallen's testimony little weight because of her failure to recognize any ethical considerations in accepting the child as a patient after being a

---

[5] The psychologist defined enmeshment as a psychological process that undermines an individual from separating herself psychologically from another.

[6] The defendant saw a counselor from June through December, 1998, regarding the fate of her marriage, where she wanted to live and her mother's illness.

[7] Hanley-Kallen had gained necessary background information regarding the child and her family from the information provided to her in confidence by the plaintiff and the defendant at the prior special master proceedings. Hanley-Kallen made no effort to confirm that the plaintiff knew that she was treating the child.

special master and her failure to realize the potential psychological effects of asking the child her preference.

The court dissolved the marriage and ordered joint legal custody with primary physical custody to the plaintiff. This appeal followed.

I

The defendant first claims that the court improperly failed to consider the child's desire to live with her mother. Specifically, the defendant argues that the court improperly discounted the child's preference without finding that the child was not of a sufficient age or was incapable of forming an intelligent preference. We disagree.

"An appellate court will not disturb a trial court's orders in domestic relations cases unless the court has abused its discretion or it is found that it could not reasonably conclude as it did, based on the facts presented. . . . In determining whether a trial court has abused its broad discretion in domestic relations matters, we allow every reasonable presumption in favor of the correctness of its action." (Citation omitted; internal quotation marks omitted.) *Costa* v. *Costa*, 57 Conn. App. 165, 168, 752 A.2d 1106 (2000).

Our Supreme Court has stated: "In making a determination of custody . . . the trial court is bound to consider the child's present best interests and not what would have been in her best interests at some previous time. . . . [T]he court must . . . take account of the parents' past behavior, since it must evaluate their present and future parenting ability and the consistency of their parenting for the purpose of determining which parent will better foster the children's growth, development and well-being." (Citation omitted; internal quotation marks omitted.) *Blake* v. *Blake*, 207 Conn. 217, 224–25, 541 A.2d 1201 (1988).

"[W]hether the child's preferences and feelings as to custody and visitation are a significant factor in the court's ultimate determination of the best interest of the child will necessarily depend on all the facts of the particular case, including the child's age and ability intelligently to form and express those preferences and feelings." *Gennarini* v. *Gennarini*, 2 Conn. App. 132, 137, 477 A.2d 674 (1984); see also General Statutes 46b-56 (b).[8] "Section 46b-56 (b) does not require that the trial court award custody to whomever the child wishes; it requires only that the court take the child's wishes into consideration. . . . The ultimate concern of the trial court is to decide what is in the best interests of the child. . . . Although the child's wish is one factor for the court to consider in making that decision, it is certainly not the only one." (Citations omitted.) *Knock* v. *Knock*, 224 Conn. 776, 788–89, 621 A.2d 267 (1993). "[E]ven when [a child's preference] is elicited, the information may be of questionable accuracy. A child caught up in the maelstrom of family strife may produce, to the psychologically untrained eye and ear, distorted and thus misleading images not only of the child's parents but of the child's own feelings; and those feelings themselves may be transient." *Gennarini* v. *Gennarini*, supra, 137.

The defendant argues that the court improperly refused to consider the child's preference, but refers to nothing in the record to support this claim. She simply argues that the court's excoriation of Hanley-Kallen's testimony was a denial of consideration of the child's preference.[9] We do not agree.

---

[8] General Statutes § 46b-56 (b) provides in relevant part: "In making . . . any order with respect to custody or visitation, the court shall (1) be guided by the best interests of the child, giving consideration to the wishes of the child if the child is of sufficient age and capable of forming an intelligent preference . . . ."

[9] In its memorandum of decision, the court indicated that it was troubled that Hanley-Kallen did not recognize her conflicting interests in the matter, as a court-appointed special master and later as the child's individual psy-

On the basis of our review of the court's memorandum of decision, we conclude that the court did consider the child's preference for custody. The child told Diller that if she could arrange things the way that she wanted, she would have her parents change houses so that she could live primarily with her mother, but still attend the school that she preferred. Although the child wanted to live with her mother, she also consistently expressed her desire to remain in Connecticut where her father, friends, teachers, home and school are located.

In addition to the child's preference, the court considered both parents' present and future parenting abilities as required by *Blake* v. *Blake*, supra, 207 Conn. 224–25. The court evaluated which parent would better foster the child's future growth, development and well-being, and the facts in the record support the court's conclusion that the plaintiff would do so. Therefore, the court's award of primary physical custody to the plaintiff was not an abuse of discretion.

## II

The defendant's second claim is that the court applied the wrong standard of law in determining primary physical custody. Specifically, she claims that the court improperly failed to consider the factors enunciated in

chologist. The court also was concerned with Hanley-Kallen's invitation to the child to discuss her preference as to with whom she wanted to live, without regard to the psychological effect it would have on the child to have court orders that did not meet her requests on the one hand or, on the other hand, the feeling of empowerment that she could direct the outcome of the proceedings by expressing her position. With these concerns in mind, the court accorded Hanley-Kallen's expert opinion little weight. " 'We have never held, and decline now to hold, that a trial court is bound to accept the expert opinion of a family relations officer. As in other areas where expert testimony is offered, a trial court is free to rely on whatever parts of an expert's opinion the court finds probative and helpful.' *Yontef* v. *Yontef* 185 Conn. 275, 281, 440 A.2d 899 (1981)." *Franklin* v. *Dunham*, 8 Conn. App. 30, 33, 510 A.2d 1007 (1986).

*Ireland* v. *Ireland*, 246 Conn. 413, 429–32, 717 A.2d 676 (1998) (en banc), in deciding which parent should have primary physical custody of the child. We do not agree.

"A trial court is in an advantageous position to assess the personal factors so significant in domestic relations cases, and its orders in such cases will not be reversed unless its findings have no reasonable basis in fact or it has abused its discretion, or unless, in the exercise of such discretion, it applies the wrong standard of law. . . . [W]e do not review the evidence to determine whether a conclusion different from the one reached could have been reached." (Citations omitted; internal quotation marks omitted.) *Crowley* v. *Crowley*, 46 Conn. App. 87, 90–91, 699 A.2d 1029 (1997).

In *Ireland* v. *Ireland*, supra, 246 Conn. 431–32, our Supreme Court provided additional considerations for a trial court to evaluate when determining a child's best interest in *postjudgment relocation matters*. In *Ireland*, a parent with primary physical custody sought to relocate with the child outside the state of Connecticut after having primary physical custody for six years. The *Ireland* court held that "a custodial parent seeking permission to relocate bears the initial burden of demonstrating, by a preponderance of the evidence, that (1) the relocation is for a legitimate purpose, and (2) the proposed location is reasonable in light of that purpose. Once the custodial parent has made such a prima facie showing, the burden shifts to the noncustodial parent to prove, by a preponderance of the evidence, that the relocation would not be in the best interests of the child." Id., 428.

To determine whether the proposed relocation is for a legitimate purpose and is reasonable to achieve that purpose, the *Ireland* court held that a trial court must evaluate the following factors: "[E]ach parent's reasons for seeking or opposing the move, the quality of the

relationships between the child and the custodial and noncustodial parents, the impact of the move on the quantity and quality of the child's future contact with the noncustodial parent, the degree to which the custodial parent's and child's life may be enhanced economically, emotionally and educationally by the move, and the feasibility of preserving the relationship between the noncustodial parent and child through suitable visitation arrangements." (Internal quotation marks omitted.) Id., 431–32.

The court further explained: "[N]o single factor should be treated as dispositive or given such disproportionate weight as to predetermine the outcome. . . . [T]here are undoubtedly . . . many cases where less frequent but more extended visits over summers and school vacations would be equally conducive, or perhaps even more conducive, to the maintenance of a close parent-child relationship, since such extended visits give the parties the opportunity to interact in a normalized domestic setting. . . .

"[Our Supreme Court] emphasize[d] that the list of factors [it] endorse[d] . . . should not be considered exclusive, nor should any single factor be presumed to carry dispositive weight. Moreover, any other facts or circumstances that could have a bearing on the court's determination of the child's best interests should be considered and given the appropriate weight in a court's analysis. We believe that the factors set forth in this opinion, considered with an eye toward ensuring the child a life as comfortable, stable and happy as possible, will prove valuable to courts in determining the best interests of the child." (Citation omitted; internal quotation marks omitted.) Id., 434–35.

Although the defendant claims that the court refused to apply the *Ireland* factors, the reasoning articulated by the court shows that it in fact did so. Because the

court did apply the *Ireland* factors in reaching its custody decision, we will assume, without deciding, that such application was proper.

*Ireland* does not mandate that a court consider each factor individually and separately. Our Supreme Court even encouraged trial courts to consider any appropriate additional factors and to weigh each factor at the court's discretion, so long as no single factor considered was dispositive or was "given such disproportionate weight as to predetermine the outcome." Id., 434.

## A

The first *Ireland* factor that the court considered was each parent's reasons for seeking or opposing the move. This factor is to assist the court in determining whether the parent's reasons for the move are legitimate. The court evaluated the reasons that the defendant provided for the move and found that they were not legitimate. See footnote 4. Even if the reasons for relocating were legitimate, the court found they would not achieve the ends stated by the defendant because one of the reasons was moot and the other two were invalid. The defendant, therefore, failed to meet her burden of proof.[10] Even if the defendant had met her burden of proof, then the burden was shifted to the plaintiff to prove that the move was not in the best interest of the child, and the plaintiff met his burden. The court found that it was in the child's best interest to continue living in

[10] The defendant argues that *Ireland* required the court to give her the benefit of the doubt in her decision to relocate. We disagree.

*Ireland* establishes that the initial burden of proof is on the custodial parent desiring to relocate. Here, the defendant was *not* the custodial parent. The defendant argues that for purposes of *Ireland*'s burdens of proof in a split custody situation, each parent should be regarded as a custodial parent. Even if we were to assume, arguendo, that the defendant was a custodial parent, she had the initial burden of proving that the move was for legitimate purposes and that the move was a reasonable way of achieving those legitimate purposes before the burden would shift to the plaintiff. The defendant's argument that the court was required to give her the benefit of the doubt fails.

Connecticut. The child's school, her friends and her father were here, all of which the child would lose if she moved to New Jersey. The child would gain very little in her move to New Jersey. Therefore, the court found that it was not in the child's best interest to dispossess her of the security of her home and school in Connecticut.[11]

B

The second *Ireland* factor that the court considered was the quality of the relationship between the child and each parent. The court found that the child was strongly connected to both of her parents and relied on both of them for care and nurturing. Although the defendant mother was the primary caretaker for the first several years of the child's life, her father had become very important to the child as well.

The defendant argues that the court ignored the testimony of family relations counselor Joseph Iassogna, Hanley-Kallen and both parties that the defendant was the child's primary psychological parent and caretaker for the first seven years of her life. She argues that the court rewarded the plaintiff for being uninvolved in the child's life and then recently changing his attitude. We disagree.

The fact that the defendant had been the child's primary psychological parent and caretaker in the past was relevant but was not dispositive on the issue of

---

[11] Counsel for the minor child notes, in support of the appellant's argument, that New Jersey was not unknown territory for the defendant and the child. The defendant was born and raised in New Jersey, and the child and the defendant often visited her family in New Jersey. In addition, the minor child argues that relocation has been permitted in cases where the party has had fewer connections and lesser reasons than the ones presented here. We note that family cases are particularly fact bound. Despite the minor child's familiarity with New Jersey and the results in other Superior Court cases, we conclude that the court here neither made clearly erroneous findings of fact, nor abused its discretion in determining custody.

physical custody. Our Supreme Court in *Blake* v. *Blake*, supra, 207 Conn. 224–25, specifically indicated that an evaluation of the past was not enough. Although the mother had been important in the past and the father had not been as involved in the child's life for her first several years, he had become very involved in her life at the time of trial. The child's own therapist acknowledged that both parties were psychological parents of the child. We conclude that the court properly applied the standard established in *Blake*.

The record supports the court's finding that the defendant failed to look at the move in the context of what was best for the child. She adamantly refused to consider staying in Connecticut. Diller concluded that she had problems of enmeshment with the child that required immediate, intensive psychotherapy. Diller concluded that the defendant had viewed the child as an extension of herself and that the enmeshment was to the point where the child's relationship with the defendant lacked healthy boundaries. In addition, the severe effects of the defendant's stress made it difficult for the defendant to perceive and to address the child's needs. This contrasts with the plaintiff, who had improved his relationship with the child by becoming immersed in her life and by obtaining therapeutic guidance to assist him with his psychological problems.

### C

The third *Ireland* factor that the court considered was the impact of the move on the quantity and quality of the child's future contact with her noncustodial parent. The court found that the quantity and quality of the child's future contact with the plaintiff would be affected because the plaintiff, a full-time physician, would have to pursue his access to the child aggressively to ensure the continued growth of their relationship.

The court found a lack of any assurance that the defendant would make the necessary efforts to continue to include the plaintiff in the child's life or in making decisions regarding the child if she were to live in New Jersey with the defendant. Since the pendente lite orders, all of the plans that the defendant had made for the child were without consultation with the plaintiff.[12] This clearly was an indication that the plaintiff would continue to be excluded from the decisions regarding the child's life. The court properly concluded that to permit the removal of the child to New Jersey would decrease the quality of her relationship with her father and increase the child's reliance on her mother, thereby hindering the child's future growth.

### D

The fourth *Ireland* factor that the court considered was the degree to which the custodial parent's and the child's life would be enhanced economically, emotionally and educationally by the proposed move. The court noted that the defendant was not working to her full potential and only worked part-time. On the other hand, the plaintiff had a successful, private medical practice. Economically, the child's life would be more enhanced by living in Connecticut. As to the emotional and educational factors, the court found that the defendant was totally inattentive to the needs of the child to live in the house in which she always had lived and to attend the school that she preferred and liked and where she has a lot of friends. The defendant assumes that the child will be happy if the defendant is happy, a state

---

[12] The defendant already had applied for the child to attend another school without the knowledge, consultation or consent of the plaintiff, despite the fact that the parties had joint legal and physical custody of the child during the pendente lite period. The defendant even had the child take the admission test and walked through the school grounds with her. As an afterthought, the defendant, already having preselected her favorite one, agreed that she would discuss the several school choices available with the plaintiff.

of affairs that the defendant insisted could materialize only if they lived in New Jersey. Although the lives of the defendant and the child may be enhanced by improving interfamily relationships with the defendant's family, there is little other benefit. The child would be attending a new school where she does not know anyone at a time in her life when social bonds outside of her home are increasingly important to her. To permit the removal of the child to New Jersey would decrease the quality of her relationship with her father and increase the child's reliance on her mother, thereby hindering the child's future growth.

## E

Finally, the fifth *Ireland* factor that the court considered was the feasibility of preserving the relationship between the noncustodial parent and the child through suitable visitation arrangements. Both parents were willing to travel to the neighboring state to visit the child. The plaintiff would have to be more aggressive in doing so, however, because of the limited time that he had available. The court did not abuse its discretion in favoring the plaintiff as to this factor.

After reviewing all of the evidence, we conclude that the court did not abuse its discretion in awarding custody to the plaintiff.

## III

The defendant's third claim is that the court improperly burdened her fundamental right to interstate travel through its custody determination. Because the defendant did not raise this issue in the trial court, she seeks review under *State* v. *Golding*, 213 Conn. 233, 239–40, 567 A.2d 823 (1989).

"Our Supreme Court held in *Golding* that a party can prevail on an issue not preserved at trial only if all of the following four conditions are met: (1) the record

is adequate to review the claim; (2) the claim is of constitutional magnitude alleging the violation of a fundamental right; (3) the alleged constitutional violation clearly exists and clearly deprived the appellant of a fair trial; and (4) if subject to harmless error analysis, the state has failed to demonstrate harmlessness of the alleged constitutional violation beyond a reasonable doubt. . . . If any one of these conditions is not met, the appellant cannot prevail. . . . The first two questions relate to whether a defendant's claim is reviewable, and the last two relate to the substance of the actual review. . . . *Golding* applies to civil as well as criminal cases." (Citations omitted; internal quotation marks omitted.) *In re Shyliesh H.*, 56 Conn. App. 167, 177–78, 743 A.2d 165 (1999).

In this case, the first two prongs of *Golding* are satisfied. First, the record is adequate to review the defendant's claim. Second, a claim concerning a burden on a defendant's right to interstate travel is of constitutional magnitude. See *Leech* v. *Veterans' Bonus Division Appeals Board*, 179 Conn. 311, 315, 426 A.2d 289 (1979). The defendant has failed, however, to meet the third requirement of *Golding* that a constitutional violation clearly exists and clearly deprived her of a fair trial.

"[F]reedom to travel throughout the United States has long been recognized as a basic right under the Constitution." (Internal quotation marks omitted.) *Shapiro* v. *Thompson*, 394 U.S. 618, 631, 89 S. Ct. 1322, 22 L. Ed. 2d 600 (1969). "It is well settled that a violation of constitutional magnitude may be established even though there has not been a complete abridgement or deprivation of the right. A constitutional violation may result, therefore, when a constitutional right has been impermissibly burdened or impaired by virtue of state action that unnecessarily chills or penalizes the free exercise of the right. Thus, [w]hatever might be said of [the state's] objectives, they cannot be pursued by

means that needlessly chill the exercise of basic constitutional rights. . . . The question is not whether the chilling effect is incidental rather than intentional; the question is whether that effect is unnecessary and therefore excessive." (Internal quotation marks omitted.) *State* v. *Alexander*, 50 Conn. App. 242, 249, 718 A.2d 66 (1998), rev'd on other grounds, 254 Conn. 290, 755 A.2d 868 (2000).

We disagree that the custody order impermissibly burdens the defendant's right to travel. The defendant argues that, because the court's custody decision was wrong, it necessarily impinged on her constitutional right to relocate to New Jersey. Our conclusion that the court's decision is proper completely negates this claim. The defendant offers no authority in support of the proposition that where an appellate court agrees with the trial court's custody decision, it must nevertheless reverse the judgment where the parent who did not prevail has decided to relocate.

IV

The defendant also claims that the court improperly found material facts without evidence or with inadequate evidence to support them. Specifically, the defendant claims that the court improperly found the following facts: (1) the child disliked her school in New Jersey; (2) the defendant initiated a complaint about the plaintiff with the department of children and families; (3) the plaintiff paid $2000 per month to the defendant at all relevant times; (4) the plaintiff was concerned that the defendant would frustrate his efforts to visit the child; (5) the defendant's relations with her family were attenuated; (6) the defendant was unable to see the child as a distinct individual; (7) the child had lived all of her life in New London, and her school and her friends are in New London; and (8) the child was most secure in the house in which she always had lived and

at the school that she always had attended, and her life was in Connecticut. We do not agree.

"Appellate review of a trial court's findings of fact is governed by the clearly erroneous standard of review. The trial court's findings are binding upon this court unless they are clearly erroneous in light of the evidence and the pleadings in the record as a whole. . . . A finding of fact is clearly erroneous when there is no evidence in the record to support it . . . or when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." (Internal quotation marks omitted.) *Costa* v. *Costa*, supra, 57 Conn. App. 168. "It is within the province of the trial court to find facts and draw proper inferences from the evidence presented." (Internal quotation marks omitted.) *Bowers* v. *Bowers*, 61 Conn. App. 75, 78, 762 A.2d 515 (2000), cert. granted on other grounds, 255 Conn. 939, 767 A.2d 1211 (2001).

On the basis of our review of the record, we conclude that the defendant's wholesale attack is basically an attempt to relitigate the facts. The facts found by the court are supported by the evidence presented, and, therefore, the findings of the court are not clearly erroneous.

V

The defendant's final claim is that the court improperly found that Hanley-Kallen behaved unethically in accepting the child as her patient. Specifically, the defendant argues that the court improperly relied on the ethical standards of the American Psychological Association that had not been the subject of any testimony or an exhibit during the trial without notice to her or an opportunity to be heard. We are unpersuaded.[13]

[13] The plaintiff argues that we should not review this claim because the defendant failed to object at trial to the questioning concerning the witness' professional ethics. The defendant maintains that the trial court, in its memo-

"Notice to the parties is not always required when a court takes judicial notice. Our own cases have attempted to draw a line between matters susceptible of explanation or contradiction, of which notice should not be taken without giving the affected party an opportunity to be heard . . . and matters of established fact, the accuracy of which cannot be questioned, such as court files, which may be judicially noticed without affording a hearing." (Citations omitted.) *Moore* v. *Moore*, 173 Conn. 120, 121–22, 376 A.2d 1085 (1977). "[F]acts may be judicially noticed which are so notorious that the production of evidence would be unnecessary, or which the judicial function supposes the judge to be familiar with, in theory at least, or which, although they are neither notorious nor bound to be judicially known, are capable of such instant and unquestionable demonstration, if desired, that no party would think of imposing a falsity on the tribunal in the face of an intelligent adversary." (Internal quotation marks omitted.) *State* v. *Griffin*, 251 Conn. 671, 702–703, 741 A.2d 913 (1999).[14]

The ethical rules applicable to the profession of a witness are permissible for judicial notice because a professional, who is a member of an association, is held accountable to know those ethical rules. See, e.g., *Gagne* v. *Vaccaro*, 255 Conn. 390, 403, 766 A.2d 416 (2001). Here, upon inquiry by the court, Hanley-Kallen admitted that she was a member of the American Psy-

---

randum of decision, relied on two publications that had not been introduced into evidence at trial. Because she did not know that the court used those materials until she read the court's decision, the defendant claims that the issue should be reviewed because it arose subsequent to trial. We agree with the defendant. See Practice Book § 60-5 ("court shall not be bound to consider a claim unless it was distinctly raised at the trial or *arose subsequent to the trial*" [emphasis added]); see also *Hayward* v. *Hayward*, 53 Conn. App. 1, 5–6, 752 A.2d 1087 (1999).

[11] We note that the rule in *Griffin* is now codified in Conn. Code Evid. § 2-2 (b).

chological Association, that she lived by the ethical rules established by the association and that she failed to consult the rules before deciding to become the child's therapist. In its memorandum of decision, the court referred to the American Psychological Association's ethical rules, which never had been introduced as evidence, and found that Hanley-Kallen violated those rules. We conclude that the court's action was proper.

The defendant had notice that Hanley-Kallen's ethics were at issue with the court from the questions that the court posed to Hanley-Kallen at trial.[15] The defen-

[15] The following colloquy took place at trial:

"[Child's Attorney]: Do you have any opinion as to whether your role as a special master on October 16th of 1998 has any potential impact from a conflict perspective with the therapy sessions you have undertaken with [the child]?

"The Court: If no one is going to object, I want to know whether it is a personal opinion, a moral opinion or a professional opinion.

"[Hanley-Kallen]: Professional opinion.

"[Child's Attorney]: Do you have a professional opinion, Dr. Hanley, as to whether there is any conflict as your role as having been a special [master] and subsequent therapist for [the child]?

"[Hanley-Kallen]: Professionally, I do not see a conflict.

"[Child's Attorney]: Now, Dr. Hanley, when did you begin seeing [the child]?

"[Hanley-Kallen]: I believe it was November.

"The Court: I want to ask a question about that. Does that mean if you are continued on the list of VIP masters you will continue if the occasion presents itself to continue to see a member of the family that you may have done mastering for?

"[Hanley-Kallen]: If I had not formulated an opinion that was negative about one of the parties, then I would continue to be open to seeing one of the members of the parties."

The court further questioned the witness as follows:

"The Court: Are you licensed by the state of Connecticut?

"[Hanley-Kallen]: Yes.

"The Court: Are there licensing requirement regulations in the state?

"[Hanley-Kallen]: Yes.

"The Court: And you are a member of like the American Psychological Association or something like that?

"[Hanley-Kallen]: Yes, Your Honor.

"The Court: And do you live by their rules on ethics and stuff like that?

"[Hanley-Kallen]: Yes.

dant was present during the court's questioning, but failed to object or to ask to be heard. The court's judicial notice of the ethical rules applicable to Hanley-Kallen was proper.

The judgment is affirmed.

In this opinion the other judges concurred.

---

"The Court: Any organization other than the APA?

"[Hanley-Kallen]: Diplomat status in child psychology and child custody evaluation.

"The Court: Does that subject you to any other association rules on ethics?

"[Hanley-Kallen]: Yes.

"The Court: Who's that?

"[Hanley-Kallen]: The American Forensic Association. I just became diplomat. I am not sure of the initials.

"The Court: Did you consult with the ethical rules before making the decision to become [the child's] therapist?

"[Hanley-Kallen]: No, I did not.

"The Court: How about the American Forensic Association?

"[Hanley-Kallen]: No, I did not."