## CLIFFORD WREN ET AL. *v.* MACPHERSON INTERIORS, INC., ET AL.
## (AC 19575)

Foti, Mihalakos and Flynn, Js.

Argued January 7—officially released April 23, 2002

*Jeffrey R. Babbin*, for the appellants (defendants).

*Robert G. Golger*, for the appellees (plaintiffs).

*Opinion*

FOTI, J. The defendants, MacPherson Interiors, Inc.[1] (MacPherson), Robert Roth, Roger Roth and Robert Allred, appeal from the judgment in favor of the plaintiffs, Clifford Wren and Barbara Wren, rendered after a hearing in damages on the plaintiffs' breach of contract claim. The defendants claim that the court improperly (1) awarded damages based on the evidence adduced at the hearing in damages, (2) denied their motion to open the judgment and (3) denied their renewed motion to open the judgment. We affirm the judgment of the trial court.

The court found the following facts. On October 24, 1986, MacPherson agreed to sell its assets to RAR, Inc. (RAR), for $180,000. At that time, Robert Roth, Roger Roth and Allred owned RAR. The plaintiffs served on the board of directors of MacPherson. Clifford Wren was also the vice president of the company and a shareholder, and Barbara Wren was the president. MacPherson, as part of the purchase and sale agreement, was dissolved, and RAR obtained the rights to and assumed the name MacPherson.[2]

On October 30, 1986, MacPherson entered into a contract with Clifford Wren and Barbara Wren individually.[3] Essentially, it consisted of MacPherson's promise to

---

[1] The defendant MacPherson Interiors, Inc., formerly was known as RAR, Inc.

[2] Accordingly, MacPherson is the named corporate defendant in the underlying action.

[3] The contract was based on what the parties referred to as a consultation and noncompete agreement.

pay the Wrens $445,000 by monthly installment payments over a six year period. MacPherson further agreed that it would provide the Wrens with certified financial statements every quarter and that its failure to do so, or failure to make a monthly installment payment, would amount to a material breach of contract. The defendants also were required to secure their obligations to the Wrens by executing a security agreement and filing a financing statement to perfect that agreement. Further, the defendants personally guaranteed $180,000 of MacPherson's corporate debt to the Wrens. In return, the Wrens promised not to compete with RAR within a fifty mile radius, and Clifford Wren agreed to consult RAR in the operation of the company for the same six year period as the installment payment period.

In 1987, the defendants breached the contract by failing to provide the plaintiffs with certified financial statements in accordance with the contract terms. Additionally, in May, 1990, the defendants failed to make their monthly installment payment, and they made no further payments after that date. The plaintiffs commenced the present breach of contract action on February 18, 1992.

The plaintiffs applied for and were granted a prejudgment remedy in the amount of $700. In preparation for trial, the plaintiffs filed seven separate discovery requests from April, 1992, through June, 1993. The defendants failed to comply with all seven requests. In response, the plaintiffs filed eight motions to compel, which were granted and which the defendants ignored. On May 31, 1994, the court ordered the defendants to comply with the motions to compel within thirty days. After the defendants failed to comply with the order, the court granted the plaintiffs' motion for a default[4]

---

[4] A default judgment "admits the material facts that constitute a cause of action . . . and entry of default, when appropriately made, conclusively determines the liability of a defendant. . . . Despite the entries of default,

judgment on December 5, 1994. Following a continuance,[5] a hearing in damages was set for August 7, 1998. On August 4, 1998, the defendants filed a motion for a continuance, which was denied and the case was assigned for an immediate hearing before the court. The defendants failed to appear at that hearing and, on the basis of the uncontested testimony of Barbara Wren, the court rendered judgment for the plaintiffs.

In response, the defendants timely filed a motion to open the judgment on September 2, 1998. On February 8, 1999, that motion was still pending. Before the court ruled on the motion, it ordered defense counsel to file an affidavit, within one week, explaining in "meticulous detail" why he had failed to appear at the hearing in damages. Defense counsel failed to comply with the court's order, and the court denied the defendants' motion. Finally, on June 22, 1999, more than four months after the court rendered judgment, the defendants, then represented by new counsel, renewed their motion to open the judgment. The court denied that motion, and this appeal followed. Additional facts and procedural history will be set forth as necessary.

had the defendants sought to challenge the right of the plaintiffs to maintain their action, or had they intended to prove any matter of defense, they would have been permitted to do so at the hearing in damages upon written notice to the plaintiffs. See Practice Book § 367 [now § 17-34]. Moreover, pursuant to Practice Book § 374 [now § 17-40], the defendants would have been permitted to appear and offer evidence to reduce the amount of damages claimed without giving any notice." (Citations omitted; internal quotation marks omitted.) *LaRosa* v. *Kline*, 36 Conn. App. 501, 503–504, 651 A.2d 1324 (1995). Because the defendants failed to secure the opportunity to challenge the plaintiffs' action and to present any defenses, the only issue at the hearing in damages was the amount that they owed to the plaintiffs. Though the defendants still had an opportunity to present evidence to reduce the amount of damages at the hearing in damages, that opportunity was lost when the defendants' failed to appear at the hearing.

[5] The court scheduled a hearing in damages for an earlier date but rescheduled it because there was some question as to whether the defendants had received proper notice of that hearing date. As a result, the court ordered a continuance and rescheduled the hearing.

## I

The defendants first claim that the court awarded the plaintiffs an improper amount of damages. The defendants argue that the court's findings were not supported by the evidence adduced at the hearing in damages and that the court's interpretation of the contract terms was contrary to law.[6] We disagree.

The following additional facts are necessary to our resolution of the defendants' claim. As previously noted, the court granted the plaintiffs' motion for a default judgment against the defendants. The only remaining issue was the measure of damages, which was to be determined at the hearing in damages.[7] The defendants failed to attend the hearing in damages, and the court allowed the hearing to commence in their absence. The court heard testimony from a single witness, Barbara Wren. She testified that the defendants had failed to provide certified quarterly financial statements from the outset of the transaction. She further testified that the defendants had failed to comply with the payment provision of the contract as of May 31, 1990, and that she had notified them in writing of their failure to pay. On the basis of Barbara Wren's uncontested testimony, the court awarded the plaintiffs damages in the amount of $710,871.50.[8] Thereafter, the defendants filed a motion seeking an articulation of the judgment rendered after the hearing in damages, which was granted.

We first note our standard of review. "When the factual basis of the trial court's decision is challenged on appeal, the role of this court is to determine whether

---

[6] The defendants do not ask this court to interpret or to construe the contract terms. Nevertheless, because their argument is in part based on the contract terms, we must look at those terms to resolve the defendants' claim.

[7] The amount of damages hinged on the date of default.

[8] Robert Roth, Roger Roth and Allred are personally liable to the plaintiffs for $327,315.68 of that amount based on their personal guarantee of $180,000 plus $147,315.68 of statutory interest.

the facts set out in . . . the decision are supported by the evidence or whether, in light of the evidence and the pleadings in the whole record, those facts are clearly erroneous. . . . On appeal, the function of this court is limited solely to the determination of whether the decision of the trial court is clearly erroneous." (Citations omitted; internal quotation marks omitted.) *DiNapoli* v. *Doudera*, 28 Conn. App. 108, 111–12, 609 A.2d 1061 (1992). "A finding of fact is clearly erroneous when there is no evidence in the record to support it . . . or when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." (Internal quotation marks omitted.) *Azia* v. *DiLascia*, 64 Conn. App. 540, 558, 780 A.2d 992, cert. denied, 258 Conn. 914, 782 A.2d 1241 (2001). "[W]e do not retry the facts or pass on the credibility of witnesses." (Internal quotation marks omitted.) *Aubin* v. *Miller*, 64 Conn. App. 781, 787, 781 A.2d 396 (2001). "[W]here the legal conclusions of the court are challenged, we must determine whether they are legally and logically correct and whether they find support in the facts set out in the memorandum of decision . . . ." (Internal quotation marks omitted.) Id., 786.

Additionally, because our resolution of the defendants' claim involves a review of the contractual language, we note that "[w]here . . . there is clear and definitive contract language, the scope and meaning of that language is not a question of fact but a question of law. . . . In such a situation our scope of review is plenary, and is not limited by the clearly erroneous standard." (Internal quotation marks omitted.) *Alco Standard Corp.* v. *Charnas*, 56 Conn. App. 568, 571, 744 A.2d 924 (2000). "[W]e interpret contract language in accordance with a fair and reasonable construction of the written words and . . . the language used must be accorded its common, natural, and ordinary meaning

and usage where it can be sensibly applied to the subject matter of the contract. . . . If the terms of [a contract] are clear, their meaning cannot be forced or strained by an unwarranted construction to give them a meaning which the parties obviously never intended. . . . A court will not torture words to import ambiguity where the ordinary meaning leaves no room for ambiguity, and words do not become ambiguous simply because lawyers or laymen contend for different meanings." (Citation omitted; internal quotation marks omitted.) *Rumbin* v. *Utica Mutual Ins. Co.*, 254 Conn. 259, 286, 757 A.2d 526 (2000). Moreover, "[a] contract is to be construed as a whole and all relevant provisions will be considered together." (Internal quotation marks omitted.) *O'Bryan* v. *O'Bryan*, 67 Conn. App. 51, 55, 787 A.2d 15 (2001), cert. granted on other grounds, 259 Conn. 911, 789 A.2d 995 (2002).

The defendants ask this court to review the evidence on which the trial court based its factual findings, to make different findings based on that evidence and to reach a conclusion different from that of the trial court. We decline to do so.

In its articulation, the court set forth the basis of its factual findings. The court noted its reliance on Barbara Wren's uncontested testimony. Her testimony concerned two specific contract provisions that required the defendants to provide certified financial statements and their obligation to make monthly payments to the plaintiffs. She testified that the defendants failed to provide the certified financial statements from the outset of the transaction in 1987, and that the default in payments occurred in May, 1990.

On the basis of Barbara Wren's uncontested testimony, the court found that "[i]n May of 1990, RAR, Inc., defaulted both in that portion of the purchase price dealing with the installment payments as well as [its]

obligation to furnish quarterly certified financial statements." The court explained, however, that because the plaintiffs apparently did not rely on the default regarding the financial statements and because they had computed damages following the installment payment default, it would use May 31, 1990, "as the date of default for purposes of computing all damages." The court merely chose a date from which to compute damages that was consistent with the plaintiffs' calculation of damages. In doing so, the court did not find that the defendants had performed their obligations under the contract until May 31, 1990. That date signified only the installment payment default and the date from which damages were to be calculated; it did not signify the actual date of default because the record established that the defendants had defaulted long before that date by failing to provide the plaintiffs with certified financial statements beginning in 1987.

The court implicitly found that the defendants had in fact defaulted under the terms of the contract before January 1, 1988.[9] Indeed, such a finding was necessary to the court's award of damages, and it finds support in the record. At the prejudgment remedy hearing, the court noted that the parties presented it with conflicting evidence concerning whether the defendants had defaulted with regard to their obligation to provide the plaintiffs with certified financial statements. Barbara Wren's uncontested testimony at the hearing in damages resolved that conflict because the court found her testimony to be credible.

After a careful review of the entire record, we conclude that evidence exists to support the court's implicit factual finding that the defendants were in default prior to January 1, 1988. As such, the court's findings in that regard were not clearly erroneous, and we are not left

---

[9] The court alluded to that implicit finding in footnote 2 of its articulation.

with the definite and firm conviction that a mistake has been committed.

In finding, albeit implicitly, that the defendants defaulted before January 1, 1988, the court concluded that payments made by the defendants to the plaintiffs after that date did not reduce the defendants' personal guarantees under the terms of the contract. As already noted, we must determine whether the court's legal conclusion is "legally and logically correct and whether [it] find[s] support in the facts set out in the memorandum of decision . . . ." (Internal quotation marks omitted.) *Aubin* v. *Miller*, supra, 64 Conn. App. 786. Before we can determine whether the court's legal conclusion was correct, we must first examine the relevant contract provisions applicable to the defendants' claim.

The plaintiffs and the defendants executed a guarantee to secure a certain portion of the defendants' obligations under the contract. The guarantee states in relevant part: "[The defendants] [a]gree that their joint and several guarantees provided for herein shall be reduced by the amount of each payment of the Consideration provided for in the Agreement made after January 1, 1988, *provided that RAR, Inc. shall not be in default of any provision of the Agreement on that date.*" (Emphasis added.)

Section five of the contract, to which the guarantee applies, states in relevant part: "(a) RAR shall be in default of its obligation to pay any installment of the Consideration by the tenth of any month during which such installment is due and unpaid. (b) RAR shall commencing with its fiscal quarter ending March 31, 1987, provide, within twenty days of the close of such quarter, to Clifford Wren, Barbara Wren or [their] legal representative . . . a financial statement, certified as being correct by Roger Roth, Robert Roth and Robert Allred, jointly and severally . . . . Failure to provide such cer-

tified financial statement within said twenty day period following the close of each fiscal quarter until such time as the consideration shall have been paid in full shall constitute a default hereunder. (c) Clifford Wren, Barbara Wren or [their] legal representative . . . *may*, upon any such default, give written notice to RAR of such default. . . ." Finally, § 8 of the contract specifies the method of giving such notices. It states: "All notices, requests, demands and other communications made pursuant hereto shall be in writing and . . . mailed by certified mail . . . ."

The defendants essentially ask this court to adopt their interpretation of the previously mentioned contractual language and hold that "a default is effective only if declared in writing," thereby rendering the trial court's conclusion in that regard to be incorrect. Because the contract provisions regarding default are clear and definitive, we decline to do so.

The default provision of the contract does not require written notice to effectuate a default. The language is clear. It states that the plaintiffs "*may*, upon any such default, give written notice to RAR of such default. . . ." (Emphasis added.) The word "may" is discretionary in that context; see *Office of Consumer Counsel* v. *Dept. of Public Utility Control*, 252 Conn. 115, 122, 742 A.2d 1257 (2000); *Keiser* v. *Conservation Commission*, 41 Conn. App. 39, 43–44, 674 A.2d 439 (1996); and the effectiveness of a default did not depend on such notice. Had the plaintiffs sought to give notice of the default, they were required to do so according to § 8 of the contract, which they did in May, 1990.

After a careful review of the contract terms, we hold that the court's legal conclusion that the defendants' personal guarantees were not to be reduced by payments they made to the plaintiffs after January 1, 1988, is legally and logically correct and finds support in the

record. The language of the contract concerning default is clear and definitive, and the court's conclusion is in harmony with the natural, ordinary meaning of that language and with the contract as a whole. We therefore decline to disturb the court's legal conclusions.

## II

The defendants next claim that the court improperly denied their timely filed motion to open the judgment. The defendants argue that the court failed to rule on the merits of that motion and that its denial was improperly based on the defendant's counsel's failure to comply with the court's order requiring him to provide the court with an affidavit explaining why he had failed to attend the hearing in damages.[10]

We decline to address the defendants' claim because we are not required to review claims that are inadequately briefed. *State* v. *Vicente*, 62 Conn. App. 625, 632, 772 A.2d 643 (2001). The defendants failed to provide us with a standard of review and failed to proffer a single case in support of their claim. The defendants' claim of judicial error amounts to nothing more than a bald assertion. We consistently have held that "[a]nalysis, rather than mere abstract assertion, is required in order to avoid abandoning an issue by failure to brief the issue properly." (Internal quotation marks omitted.) Id.

## III

Finally, the defendants claim that the court improperly denied their renewed motion to open the judgment on the basis of its conclusion that it lacked subject

[10] The defendants further argue that because the court determined damages without regard to the terms of the contract, the judgment must be opened. Our discussion in part I fully disposes of that argument. Additionally, the defendants claim that the judgment cannot be reconciled with the plaintiffs' complaint. We find no merit to that claim because the judgment awards monetary damages for the contract claim alleged in the summons and complaint.

matter jurisdiction to adjudicate that motion on its merits. Specifically, the defendants make two arguments. First, they claim that their motion was filed within the statutory time frame set forth in General Statutes § 52-212a. Second, they claim that the court has continuing jurisdiction over their renewed motion to open the judgment because the four month limitation contained in § 52-212a does not apply to this case. We disagree.

## A

The defendants argue that their renewed motion to open the judgment complied with the four month limitation contained in § 52-212a. The defendants argue that because they timely filed their initial motion to open the judgment and that no ruling occurred on that motion until February 22, 1999, the four month time period did not begin to run until the date of the ruling and, as such, the renewed motion to open the judgment properly invoked the court's jurisdiction. That claim has no merit.

The defendants' argument is based on nothing more than mere assertion devoid of any authoritative support whatsoever. We therefore decline to address the defendants' claim in that regard because it is inadequately briefed. See *State* v. *Vicente*, supra, 62 Conn. App. 632.

## B

The defendants further argue that the four month limitation contained in § 52-212a does not affect the court's ability to consider their renewed motion to open the judgment on its merits. Specifically, the defendants argue that given the circumstances of this case, the four month limitation does not apply. We disagree.

"We begin our analysis by noting that once the question of lack of jurisdiction of a court is raised, [it] must be disposed of no matter in what form it is presented . . . and the court must fully resolve it before proceed-

ing further with the case." (Citations omitted; internal quotation marks omitted.) *Castro* v. *Viera*, 207 Conn. 420, 429, 541 A.2d 1216 (1988).

Additionally, we note the applicable law relevant to our determination of whether, in this particular case, the court has the authority to consider a renewed motion to open the judgment on its merits when such motion is filed more than four months after the judgment was rendered. Section 52-212a provides in relevant part: "Unless otherwise provided by law and except in such cases in which the court has continuing jurisdiction, a civil judgment or decree rendered in the Superior Court may not be opened or set aside unless a motion to open or set aside is filed within four months following the date on which it was rendered . . . ."

In *Kim* v. *Magnotta*, 249 Conn. 94, 99, 733 A.2d 809 (1999), the plaintiffs entered into a contractual agreement with the named defendant. The plaintiffs breached the contract shortly after its inception, and the named defendant thereafter filed an action against them. Id. The parties subsequently agreed to a stipulated judgment. Id. Thereafter, the plaintiffs brought an action alleging, inter alia, unfair trade practices in violation of the Connecticut Unfair Trade Practices Act (CUTPA), General Statutes § 42-110a et seq. *Kim* v. *Magnotta*, supra, 100. The jury found in favor of the plaintiffs on the CUTPA count, and the plaintiffs asked the court to rescind the stipulated judgment. Id. The court declined to do so because "the plaintiffs had not filed a motion to open that judgment within the four month limitation period contained in § 52-212a." Id.

Our Supreme Court stated that "the four month period does not implicate the court's subject matter jurisdiction"; id., 101; but is more accurately characterized "as a limitation on the court's general authority to grant relief from a judgment . . . ." Id., 102. Thus, a

"CUTPA violation can be the basis for setting aside a stipulated judgment, even after the passage of four months . . . ." Id., 109.

*Kim* involved the interplay between the provisions of CUTPA and § 52-212a. Under certain circumstances, the "otherwise provided by law" provision of § 52-212a provides an exception to that statute's four month limitation. CUTPA's remedial provisions provide the necessary law on which to apply that exception. As a result, the trial court's general authority to grant the plaintiffs relief from the judgment was not limited by § 52-212a in that case.

In *Gardner* v. *Pilato*, 44 Conn. App. 724, 726, 692 A.2d 843, cert. denied, 241 Conn. 922, 696 A.2d 1265 (1997), the trial court dismissed with prejudice the plaintiff's action to recover payment for services rendered after the parties had failed to attend a pretrial conference. In that case, we were presented with the question of whether "a trial court, on its own motion, has the power to open a judgment of dismissal more than four months after the judgment was rendered when it is clear that the judgment was originally rendered because of an administrative mistake and a timely motion to open had previously been made and denied." Id., 725. We noted that *Pilato* was "not the usual case"; id.; because it previously had been tried to its conclusion.[11] As a result, a dismissal based on the plaintiff's failure to attend a pretrial conference was an obviously improper outcome. We held that the court had continuing jurisdiction because it "retained jurisdiction to open the judgment and to correct an injustice." Id., 727. Thus, the circumstances of *Pilato* were such that the "continuing jurisdiction" provision of § 52-212a was implicated.

---

[11] An attorney fact finder tried the case and issued a report prior to the date of dismissal when motions concerning that report were pending. *Gardner* v. *Pilato*, supra, 44 Conn. App. 726.

The defendants ask this court to read *Kim* and *Pilato* as providing them with an exception to the four month limitation period contained in § 52-212a. We decline to do so because the defendants' reliance on those decisions is misplaced.

The defendants' misplaced reliance on *Kim* and *Pilato* is clearly demonstrated by applying the law and comparing the facts of those two cases to the facts of the present case. The decision in *Kim* provides a trial court with the authority to revisit a prior judgment under the "otherwise provided by law" provision of § 52-212a, after a party prevails on a CUTPA claim, even though the party seeking to change that prior judgment had not timely filed a motion to open the judgment within four months of its rendition. The defendants in this case have not prevailed under a law that might fall within the purview of the "otherwise provided by law" provision contained in § 52-212a. *Kim*, therefore, is distinguishable and lends little, if any, support to the defendants' claim.

*Pilato*, likewise, is distinguishable because it authorizes a court to open a judgment, after it has denied a *timely* filed motion, to correct an administrative mistake that visits injustice on a party. Unlike the plaintiff in *Pilato*, the defendants in this case did not timely file their renewed motion to open the judgment, and they were not harmed by an administrative mistake. *Pilato*, therefore, is distinguishable from the present case and is no more supportive of the defendants' claim than is *Kim*.

The facts of the present case demonstrate only that the defendants had numerous opportunities to assert and defend their position in an effort to avoid a judgment against them and, on numerous occasions, failed to do so. The defendants now attempt, by filing a renewed motion to open the judgment, to make an end

run around the four month limitation contained in § 52-212a. They do so by casting blame on the trial court, the plaintiffs and their own prior attorney while at the same time characterizing themselves as the victims of injustice. Though the defendants' prior attorney may deserve some blame, his possible negligence alone does not provide this court with a sufficient reason for holding inapplicable the four month limitation contained in § 52-212a. See *Segretario* v. *Stewart-Warner Corp.*, 9 Conn. App. 355, 363, 519 A.2d 76 (1986). Simply stated, the facts of this case are far removed from those of *Kim* and *Pilato*; they do not implicate the "otherwise provided by law" provision of § 52-212a, as in *Kim*, and they do not constitute an unusual case, thereby implicating the court's continuing jurisdiction, as in *Pilato*.

Accordingly, we conclude that in light of *Kim* and *Pilato*, § 52-212a limited the court's general authority to grant the defendants relief from the judgment because they failed to file their renewed motion to open that judgment within the four month limitation period. Because the court lacked the authority to grant the defendants relief from the judgment, it was, therefore, correct in denying the defendants' renewed motion to open the judgment without considering that motion's merits.

The judgment is affirmed.

In this opinion MIHALAKOS, J., concurred.

FLYNN, J., concurring in part and dissenting in part. I respectfully dissent in part from the result reached by the majority as to the defendant individual guarantors, Robert Roth, Roger Roth and Robert Allred. These three individual guarantors of the corporate debt of RAR, Inc., signed a written guarantee. Paragraph three of the guarantee specifies that the guarantors were to guarantee payment of $180,000 of the consideration recited and to pay upon demand the balance then due after

any default. Paragraph five reduced the amount of the guarantee by each debt payment made after January 1, 1988, unless RAR, Inc., was "in default" of any provision of the agreement on that date. This reference to "the agreement" is to a consultation and noncompete agreement which had been signed on the same day as the guarantee. It provided for two events of default. The first was triggered if payments on the debt were not made within a ten day grace period following the due date. The second, if certified financial statements were not delivered to the plaintiffs within twenty days of the end of each quarter.

The parties were not in dispute about the number of cash payments made under the consultation agreement. The plaintiff Barbara Wren testified, however, that RAR, Inc., had never provided the required financial statements properly certified. Failure to do so would constitute the second possible event of default under the consultation agreement. The significance of the date of default is that the defendant individual guarantors were to be credited for each cash payment made on the consultation agreement debt with an aliquot reduction in the $180,000 amount guaranteed unless RAR, Inc., had defaulted on the obligation to furnish financial statements.

For the guarantors to receive no credits against the guarantee, they would have to have been in default from the January 1, 1988 date set forth in the guarantee agreement. The court did not make such a finding. Instead, in its articulation, it expressly found that the default occurred "[i]n May of 1990 . . . ."

Accordingly, I would affirm only so much of the judgment against the guarantors as represents the balance of the $180,000 due after crediting all post-January 1, 1988 payments made through May, 1990, together with the reasonable costs of enforcement of the guarantee.