STATE OF CONNECTICUT *v.* KEVIN BRUCE SKIDD
(AC 26678)

Flynn, C. J., and Harper and Lavine, Js.

Argued March 19—officially released September 25, 2007

*James J. Farrell*, for the appellant (defendant).

*James M. Ralls*, senior assistant state's attorney, with whom, on the brief, were *David I. Cohen*, state's attorney, and *Steven G. Weiss*, supervisory assistant state's attorney, for the appellee (state).

### Opinion

HARPER, J. In this case, the defendant, Kevin Bruce Skidd, was convicted of intimidation based on bigotry or bias in the second degree in violation of General Statutes § 53a-181k (a) (3) for threatening an individual while using a racial slur and of breach of the peace in the second degree in violation of General Statutes § 53a-181 (a) (5). The defendant challenges the constitutionality of § 53a-181k (a) (3) on the ground that the statute is unconstitutionally overbroad on its face and unconstitutionally vague as applied to him. In addition, the defendant claims that the court improperly excluded a map from evidence and that the prosecutor committed several improprieties during closing arguments. We are unpersuaded by these claims and affirm the judgment of the trial court.

The jury reasonably could have found the following facts. On July 12, 2003, a flea market was held in the parking lot of Stamford High School. The flea market was sponsored by the school marching band and had been held every other Saturday. At the close of the flea market, at approximately 4:30 or 5 p.m., Desmond Hinds, who lived directly behind the high school, noticed a woman, Mary Surkey, placing cardboard boxes and other garbage close to the fence of the high school parking lot. The boxes were being placed in a location that was approximately fifteen yards from Hinds' front yard.

Hinds then approached Surkey, who had been a vendor at that day's flea market, and said, "Ma'am, what you're doing with this isn't very nice, very pleasant because that garbage is going to blow around. What would be nice would be . . . if you can tie up that garbage." Surkey responded that she was told to put the garbage in that location.

After this exchange, Hinds called the police to report the dumped garbage. He then reapproached Surkey, who at that time had walked back to the area where she had been selling items during the flea market. In that general area, Hinds saw a white van and some other cars. Hinds approached this area with the intention of getting the license plate number of the individuals that he associated with the dumping.

Hinds testified that he was not wearing his glasses for reading and consequently could not see the license plate number from the distance. As Hinds was trying to get the license plate number, the defendant, who was standing with Surkey, said in a loud voice, "come a little closer motherfucker," and, "this is a white man's neighborhood, and you ain't nothing but a nigger." With both hands up and his palms open, the defendant motioned for Hinds to come closer. The defendant then

closed his fingers into two fists. These actions by the defendant caused Hinds to feel as if the defendant wanted to "get physical."

After this encounter, Hinds turned away and walked back to his house. As he was returning home, a Stamford police cruiser arrived at the scene. After giving a statement to Officer David Sileo, Hinds identified the defendant, who was then arrested by the police.

On March 23, 2005, the state filed a one count information, charging the defendant with intimidation based on bigotry or bias in the second degree in violation of § 53a-181k (a) (3).[1] The defendant subsequently filed a motion for a bill of particulars pursuant to Practice Book § 41-21. On March 24, 2005, the court denied the defendant's motion because the state had filed an amended information, charging the defendant with one count of intimidation based on bigotry or bias in the second degree in violation of § 53a-181k (a) (3)[2] and one count of breach of the peace in the second degree in violation of § 53a-181 (a) (5).[3]

---

[1] Prior to the filing of this information, the defendant had filed, on March 21, 2005, a request for essential facts pursuant to Practice Book § 36-19. The court denied the defendant's motion, stating that the long form information was sufficient.

[2] General Statutes § 53a-181k (a) provides in relevant part: "A person is guilty of intimidation based on bigotry or bias in the second degree when such person maliciously, and with specific intent to intimidate or harass another person because of the actual or perceived race . . . of such other person, does any of the following: (1) Causes physical contact with such other person, (2) damages, destroys or defaces any real or personal property of such other person, or (3) threatens, by word or act, to do an act described in subdivision (1) or (2) of this subsection, if there is reasonable cause to believe that an act described in subdivision (1) or (2) of this subsection will occur."

[3] General Statutes § 53a-181 provides in relevant part: "A person is guilty of breach of the peace in the second degree when, with intent to cause inconvenience, annoyance or alarm, or recklessly creating a risk thereof, such person . . . . (5) in a public place, uses abusive or obscene language or makes an obscene gesture . . . . For purposes of this section, 'public place' means any area that is used or held out for use by the public whether owned or operated by public or private interests."

Following a jury trial, the jury returned a guilty verdict on both counts, which was accepted by the court. The defendant was then ordered to pay a fine of $3000 plus fees and was given an effective sentence of five years imprisonment, execution suspended, and five years of probation.[4]

On appeal, the defendant has raised a number of claims. The defendant first challenges the constitutionality of § 53a-181k (a) (3), claiming that the statute (1) is unconstitutionally vague as applied to his conduct, (2) is unconstitutionally overbroad and (3) violates his right to equal protection under the fourteenth amendment to the federal constitution. The defendant's other claims include an evidentiary claim that the court abused its discretion by not admitting a map of Stamford High School into evidence and a claim of prosecutorial impropriety.[5] We are not persuaded by any of these claims and affirm the judgment.

[4] The defendant was sentenced to a five year term of imprisonment, execution suspended, with five years of probation for intimidation based on bigotry or bias in violation of § 53a-181k (a) (3) and a six month sentence, execution suspended, with eighteen months probation, for breach of the peace in the second degree in violation of § 53a-181 (a) (5). The sentences were to run concurrently.

[5] The defendant argues that the court improperly allowed the state to amend the information by adding the breach of the peace charge after the start of trial. We decline to review the defendant's claim because the defendant did not preserve his claim or affirmatively request review under *State* v. *Golding*, 213 Conn. 233, 239–40, 567 A.2d 823 (1989), or the plain error doctrine. See Practice Book § 60-5.

On March 24, 2005, the state introduced, by oral motion, an amended two count information charging the defendant with intimidation based on bigotry or bias in the second degree in violation of General Statutes § 53a-181k (a) (3) and breach of the peace in the second degree in violation of General Statutes § 53a-181 (a) (5). The defendant's attorney objected to the amended information, stating, "but [the state] just filed an amended information, and I think it has to be attached to [a] motion. I'm suggesting that perhaps [the state] prepare a short form motion, file the information, then we hear these other motions." The court denied the defendant's request for a written motion to amend the information and stated that it would accept the amendment as an oral motion.

Following the court's denial of the request for a written motion, the following colloquy occurred:

I

## CONSTITUTIONALITY OF § 53a-181k (a) (3)

The defendant challenges the constitutionality of § 53a-181k (a) (3) on the theory that the statute is both

"[Defense Counsel]: No, Your Honor. We just got served with that information last Friday. Before Friday, we were charged with a statute that was repealed. For a year and a half, I've been advising the state's attorney's office, several of them, that the charge under General Statutes § 53-181b was not a crime. The statute was repealed. On Friday, we received an information. We are not dragging our feet on this at all. We've been informed of the charges—

"The Court: This case is two years old.

"[The Prosecutor]: Just one thing. I think counsel's a little bit disingenuous because with regard to the charge, the bigotry charge, counsel knew that that statute was going to be charged back on November 16 because he made a motion to recuse another judge over the issue of that statute being charged. So, counsel actually has known about that charge since November 16.

"[Defense Counsel]: I made a motion to recuse a judge who pretried the case, order[ed] the prosecutor to substitute the charges. I thought that by the fact that the court ordered a substitution of charges and a new statute to be imposed upon the defendant, I thought it would be improper for the court to then thereafter hear a case where the court was actually acting as the prosecuting authority. The court agreed and recused himself from the trial.

"[The Prosecutor]: But the point is that counsel's claiming surprise when he knew since November 16 the statute was going to be charged.

"The Court: At any rate, the court stands by the court's decision on both the defendant's request for essential facts pursuant to Practice Book § 36-19, filed March 19, 2005, and the motion for the bill of particulars pursuant to Practice Book § 41-21. The state has filed the long information today, which is March 24, 2005.

"[The Prosecutor]: Yes, Your Honor.

"The Court: The court is cognizant of the motion practice pursuant to [the] Practice Book, and the court is allowing the state to file the long form information today."

Although the defendant objected to the introduction of the amended information on the ground that it was introduced on an oral motion, he did not object on the ground that the court was permitting an amendment to the information pursuant to Practice Book § 36-18. His claim, therefore, is unpreserved.

Our Supreme Court has recognized that "a party may seek to prevail on unpreserved claims under the plain error doctrine; see Practice Book § 60-5; or, if the claims are constitutional in nature, under *Golding*, if the party affirmatively requests and adequately briefs his entitlement to such review in his main brief. See *Grimm* v. *Grimm*, 276 Conn. 377, 393 n.19, 886 A.2d 391 (2005) (plain error doctrine), cert. denied, 547 U.S. 1148, 126 S. Ct. 2296, 164 L. Ed. 2d 815 (2006); *Lebron* v. *Commissioner of Correction*, 274 Conn.

unconstitutionally overbroad and unconstitutionally vague. At the outset of our constitutional analysis of § 53a-181k (a) (3), we note that "[a]lthough the doctrines of overbreadth and vagueness are closely related . . . they are distinct. . . . A statute may be overbroad without being vague. For example, a statute making it a crime to use the words kill and President in the same sentence is not vague, but is clearly overbroad. By contrast, a vague statute may or may not be overbroad; the vice of vagueness is that someone contemplating a course of conduct, expressive or otherwise, may be unable to tell what is forbidden." (Internal quotation marks omitted.) *State* v. *DeLoreto*, 265 Conn. 145, 166, 827 A.2d 671 (2003). With the distinction between overbreadth and vagueness in mind, we turn first to the defendant's claim that the statute is unconstitutionally overbroad.[6]

A

Overbreadth

The defendant claims that the statute is unconstitutionally overbroad on its face. The defendant argues that although the state may prohibit, through its criminal statutes, the making of "true threats"; see *Virginia* v. *Black*, 538 U.S. 343, 359, 123 S. Ct. 1536, 155 L. Ed. 2d 535 (2003); the language of § 53a-181k (a) (3) is

507, 532, 876 A.2d 1178 (2005) (*Golding* review)." *State* v. *McKenzie-Adams*, 281 Conn. 486, 533 n.23, 915 A.2d 822 (2007). In this case, the defendant has failed to brief his entitlement either to *Golding* or plain error review in his main brief. We therefore decline to review his claim.

[6] We note that the defendant also has claimed that § 53a-181k (a) (3) violates his right to equal protection under the fourteenth amendment because it criminalizes threats directed at individuals of a protected class, but does not criminalize similar action directed at individuals who are not in the protected class. Because the defendant has failed to cite any case law or other legal authority in support of his position, we decline to review this claim on the ground that it has been inadequately briefed. See *Wren* v. *MacPherson Interiors, Inc.*, 69 Conn. App. 349, 359, 794 A.2d 1043 (2002).

overbroad because it encompasses any threat of physical contact. In particular, the defendant argues that the statute is overbroad because it would prohibit any communication of an intent to engage in a harmless touching of an individual because of that individual's particular race. We are not persuaded.

"A clear and precise enactment may . . . be overbroad if in its reach it prohibits constitutionally protected conduct. . . . A single impermissible application of a statute, however, will not be sufficient to invalidate the statute on its face; rather, to be invalid, a statute must reach a substantial amount of constitutionally protected conduct. . . . A [defendant] may challenge a statute as facially overbroad under the first amendment, even if the [defendant's] conduct falls within the permissible scope of the statute, to vindicate two substantial interests: (1) eliminating the statute's chilling effect on others who fear to engage in the expression that the statute unconstitutionally prohibits; and (2) acknowledging that every [person] has the right not to be prosecuted for expression under a constitutionally overbroad statute. . . . Thus, the [defendant] has standing to raise a facial overbreadth challenge to the [statute] and may prevail on that claim if he can establish that the [statute] reaches a substantial amount of constitutionally protected conduct even though he personally did not engage in such conduct." (Internal quotation marks omitted.) *State* v. *Bennett-Gibson*, 84 Conn. App. 48, 58–59, 851 A.2d 1214, cert. denied, 271 Conn. 916, 859 A.2d 570 (2004).

In addition, "[a] finding of overbreadth results in the striking down of a challenged law in its entirety: [A determination of overbreadth] . . . results in the invalidation of a law on its face rather than as applied to a particular speaker. Ordinarily, a particular litigant claims that a statute is unconstitutional as applied to him or her; if the litigant prevails, the courts carve away

the unconstitutional aspects of the law by invalidating its improper applications on a case-by-case basis. If a law restricting speech is invalidated as applied to a protected speaker, it is held inapplicable to that speaker and thus, in effect, judicially trimmed down. Overbreadth analysis, in contrast, does not reach the question whether the challenger's speech is constitutionally protected; instead it strikes down the statute entirely, because it might be applied to others not before the Court whose activities are constitutionally protected. When invalidated for overbreadth, a law is not narrowed, but rather becomes wholly unenforceable until a legislature rewrites it or a properly authorized court construes it more narrowly." (Internal quotation marks omitted.) *Leydon* v. *Greenwich*, 257 Conn. 318, 347 n.33, 777 A.2d 552 (2001).

The defendant argues that § 53a-181k (a) (3) is unconstitutionally overbroad because the statute, by its language, criminalizes all threats. The defendant correctly asserts that only "true threats" may be circumscribed by the state and that other threats may be protected as free speech. *Virginia* v. *Black*, supra, 538 U.S. 359. The defendant is mistaken, however, in his assertion that the language of § 53a-181k (a) (3) is not limited to "true threats." Viewed in light of our case law interpreting the prohibition of threats made in other situations, we conclude that § 53a-181k (a) (3) is not unconstitutionally overbroad because it is limited in its application to "true threats."

Our Supreme Court's decision in *State* v. *DeLoreto*, supra, 265 Conn. 145, informs our analysis of § 53a-181k (a) (3). The defendant in *DeLoreto* challenged the constitutionality of one of our breach of the peace statutes, § 53a-181, on the ground that the statute did not limit its prohibition to "threaten[ing] to commit any crime against another person or such other person's property . . . ." (Internal quotation marks omitted.)

Id., 151. In upholding the constitutionality of the statute, our Supreme Court emphasized that "the First Amendment . . . permits a State to ban a true threat. . . . True threats encompass those statements where the speaker means to communicate a serious expression of an intent to commit an act of unlawful violence to a particular individual or group of individuals. . . . The speaker need not actually intend to carry out the threat. Rather, a prohibition on true threats protect[s] individuals from the fear of violence and from the disruption that fear engenders, in addition to protecting people from the possibility that the threatened violence will occur." (Citations omitted; internal quotation marks omitted.) Id., 154, quoting *Virginia* v. *Black*, supra, 538 U.S. 343. "Intimidation in the constitutionally proscribable sense of the word is a type of true threat, where a speaker directs a threat to a person or group of persons with the intent of placing the victim in fear of bodily harm or death." *Virginia* v. *Black*, supra, 360.

In *State* v. *DeLoreto*, supra, 265 Conn. 154, our Supreme Court acknowledged that in order for a threat to be prohibited by statute in Connecticut, that threat must rise to the level of a "true threat," as constitutionally defined in *Virginia* v. *Black*, supra, 538 U.S. 359. We note that, although *DeLoreto* involved an "as applied" challenge to the statute that proscribes breach of the peace in the second degree, § 53a-181, the judicial gloss put on that statute also illuminates the meaning of the "threats" proscribed by § 53a-181k (a) (3). We, therefore, conclude that § 53a-181k (a) (3) is not unconstitutionally overbroad and that it prohibits only "true threats."

B

Vagueness

The defendant also claims that the language of § 53a-181k (a) (3) is unconstitutionally vague as applied. The defendant maintains that the language of § 53a-181k (a)

(3) does not provide a sufficient basis by which an ordinary individual can assess whether his or her conduct would be proscribed by the statute. Specifically, the defendant argues that the terms of the statute do not provide adequate notice that the use of a racial epithet in a verbal disagreement could constitute the conduct prohibited by this statute. The defendant also contends that the statute is unconstitutionally vague because it is prone to be enforced in an arbitrary manner. We disagree with both of the defendant's contentions.

"A statute . . . [that] forbids or requires conduct in terms so vague that persons of common intelligence must necessarily guess at its meaning and differ as to its application violates the first essential of due process. . . . Laws must give a person of ordinary intelligence a reasonable opportunity to know what is prohibited so that he may act accordingly. A statute is not void for vagueness unless it clearly and unequivocally is unconstitutional, making every presumption in favor of its validity. . . . To demonstrate that [a statute] is unconstitutionally vague as applied to [her], the [defendant] therefore must . . . demonstrate beyond a reasonable doubt that [she] had inadequate notice of what was prohibited or that [she was] the victim of arbitrary and discriminatory enforcement. . . . [T]he void for vagueness doctrine embodies two central precepts: the right to fair warning of the effect of a governing statute . . . and the guarantee against standardless law enforcement. . . . If the meaning of a statute can be fairly ascertained a statute will not be void for vagueness since [m]any statutes will have some inherent vagueness, for [i]n most English words and phrases there lurk uncertainties. . . . References to judicial opinions involving the statute, the common law, legal dictionaries, or treatises may be necessary to ascertain a statute's meaning to determine if it gives fair warning."

(Citation omitted; internal quotation marks omitted.) *State* v. *Scruggs,* 279 Conn. 698, 709–10, 905 A.2d 24 (2006).

1

We begin by assessing the defendant's claim that § 53a-181k (a) (3) is unconstitutionally vague as applied because it failed to give him adequate notice that his actions were prohibited by the statute. "The proper test for determining if a statute is vague as applied is whether a reasonable person would have anticipated that the statute would apply to his or her particular conduct. . . . The test is objectively applied to the actor's conduct and judged by a reasonable person's reading of the statute . . . . When we apply these principles to the facts of the present case, our fundamental inquiry is whether a person of ordinary intelligence would comprehend that the defendant's acts were prohibited under the ordinance." (Citation omitted; internal quotation marks omitted.) *State* v. *Bloom,* 86 Conn. App. 463, 469, 861 A.2d 568 (2004), cert. denied, 273 Conn. 911, 870 A.2d 1081 (2005).

The applicable language of § 53a-181k (a) provides in relevant part: "A person is guilty of intimidation based on bigotry or bias in the second degree when such person maliciously, and with specific intent to intimidate or harass another person because of the actual or perceived race . . . of such other person, does any of the following . . . (3) threatens, by word or act, to do an act described in subdivision (1) or (2) of this subsection, if there is reasonable cause to believe that an act described in subdivision (1) or (2) of this subsection will occur." The acts listed in subdivisions (1) and (2) are: (1) causing "physical contact with such other person" and (2) "damag[ing], destroy[ing] or defac[ing] any real or personal property of such other person . . . ." General Statutes § 53a-181k (a).

The defendant claims that the language of § 53a-181k (a) (3), as applied to him, failed to provide reasonable notice that motioning for a person to "come a little closer" could be considered a threat to cause physical contact with a person because of his or her race. The defendant's argument, however, fails to account for the context in which his words and actions occurred. As our Supreme Court emphasized in analyzing the constitutionality of our breach of the peace statute, "[a]lleged threats should be considered in light of their entire factual context, including the surrounding events and reaction of the listeners." (Internal quotation marks omitted.) *State* v. *DeLoreto*, supra, 265 Conn. 156. In light of the context of the defendant's actions and words, we conclude that a person of ordinary intelligence would comprehend that the defendant's combination of actions and words were prohibited under the statute.

In concluding that § 53a-181k (a) (3) is not unconstitutionally vague as applied to the defendant, we look to the meaning of the language of the statute. Although § 53a-181k does not define the terms used in the statute, "[t]he lack of an express definition does not, in and of itself, render a statute void for vagueness. . . . If a statute or regulation does not sufficiently define a term, it is appropriate to look to the common understanding of the term as expressed in a dictionary." (Citation omitted; internal quotation marks omitted.) *State* v. *Bloom*, supra, 86 Conn. App. 470.

Recently, this court has had the opportunity to interpret the meaning of the word "threaten" as used in the context of General Statutes §§ 53a-136 (a) and 53a-133. *State* v. *Moore*, 100 Conn. App. 122, 129, 917 A.2d 564 (2007). "While there is no definition of the word threaten in the statutes, General Statutes § 1-1 (a) provides that the commonly approved usage of the language should control. . . . A threat is 1. an indication

of something impending and usually undesirable or unpleasant . . . 2. something that by its very nature or relation to another threatens the welfare of the latter. . . . A threat has also been defined as any menace of such a nature and extent as to unsettle the mind of the person on whom it operates, and to take away from his acts that free and voluntary action [which] alone constitutes consent." (Internal quotation marks omitted.) *State* v. *Moore*, supra, 129.

In light of the ordinary meaning of "threaten," we conclude that a person of ordinary intelligence would comprehend that the defendant's conduct in calling Hinds a "motherfucker" and a "nigger," informing him that he was in a "white man's neighborhood," making a gesture for Hinds to approach him with his hands up and palms open and then making two fists constituted a threat to cause physical contact because of Hinds' race. The defendant's words and actions constituted an indication that something was impending, namely, a physical confrontation. That the defendant's actions signaled an impending confrontation is buttressed by Hinds' testimony that he believed that the defendant wanted "to get physical." We are unpersuaded that a person of ordinary intelligence would not readily comprehend that the defendant's actions were prohibited by § 53a-181k (a) (3).

2

The defendant also argues that the statute is unconstitutionally vague because it was arbitrarily and discriminatorily enforced by the Stamford police department. The defendant argues that the Stamford police department enforced the statute in an arbitrary manner because the department believed that the use of the word "nigger" was itself a crime. We are not persuaded.

To support his claim of arbitrary and discriminatory enforcement of the statute, the defendant focuses on

Surkey's testimony that Sileo stated at the crime scene that once the "nigger word is used, you have no rights." According to the defendant, Sileo's understanding of the applicability of the statute proves that the statute is enforced in an arbitrary manner.

The defendant's argument is untenable. A fair reading of Sileo's testimony demonstrates that he viewed the use of the word nigger as part of "the totality of the statements with the actions" of the defendant that led to the arrest.[7] Sileo testified that he viewed the word nigger as the "operative word" in this crime. This statement, however, did not demonstrate arbitrary enforcement of the § 53a-181k (a) (3), but rather established that the racial slur evidenced the defendant's intent to threaten Hinds because of Hinds' race. Mindful that "[t]he First Amendment . . . does not prohibit the evidentiary use of speech to establish the elements of a

---

[7] The following examination of Sileo took place at trial:

"[Defense Counsel]: Do you ever arrest somebody for saying [motherfucker or nigger]?

"[The Witness]: No.

"[Defense Counsel]: But it's—you probably—

"[The Witness]: I'm sorry—not to me.

"[Defense Counsel]: Excuse me?

"[The Witness]: I might arrest somebody for saying [that] to an individual, but not to me.

"[Defense Counsel]: To you but not–but if somebody says it to somebody else?

"[The Witness]: Possibly, sure.

"[Defense Counsel]: So, we're talking about a word that we don't like to hear and we don't like to use, but the word is nigger. Isn't that correct?

"[The Witness]: Yes.

"[Defense Counsel]: And that's the operative word here?

"[The Witness]: Yes.

"[Defense Counsel]: And if, in fact, that word was not used, would you have just driven back to the station and just forgotten this incident?

"[The Witness]: There was—there's a totality element. If you take one word out of a quote, it's not the same context. The totality of the statement with the actions—if you remove one word, it's not what occurred.

"[Defense Counsel]: Do you—I'm not sure if I understand.

"[The Witness]: You're removing one word from the statement, but there's a totality of [the defendant's] actions toward Mr. Hinds . . . ."

crime or to prove motive or intent"; *Wisconsin* v. *Mitchell*, 508 U.S. 476, 489, 113 S. Ct. 2194, 124 L. Ed. 2d 436 (1993); we find no merit in the claim that Sileo's focus on a word that helped prove the defendant's requisite intent amounted to arbitrary or discriminatory enforcement of § 53a-181k (a) (3).

## II

## EVIDENTIARY CHALLENGE

The defendant's second claim is that the court improperly excluded from evidence a map of the Stamford High School parking lot on the ground of relevance. The defendant argues that the map should have been admitted because it depicted the dimensions of the parking lot where the incident took place. The state, on the other hand, argues that the map, which was created in 2001, was not relevant because it did not accurately depict the parking lot at the time of the incident in July, 2003. Furthermore, the state urges us to affirm the court's evidentiary ruling because the defendant failed to lay a proper foundation for the relevance of the map. We agree with the state that the court properly excluded the map on the ground of relevance.

At trial, the defendant attempted to introduce a map of the parking lot of Stamford High School. After noting that the map was certified in October, 2001, almost two years prior to the incident in July, 2003, the state objected to the introduction of the map on the ground of relevance.[8] During the dialogue concerning the admissibility of the map, both the state and the court questioned whether the defendant could establish that the map was a "fair and accurate representation of the

---

[8] The court clarified, through its questioning of counsel, that the objection was on the ground of relevance and not on the authenticity of this public record.

conditions that existed at the time." Following arguments from both parties, the court sustained the state's objection.[9]

After the court sustained the state's objection, the court granted the defendant a ten minute recess to conduct further research. Following the recess, the court explained that "clearly [the map is] authentic," but the accuracy of the map's depiction of the parking lot as of July 12, 2003, was still at issue. The court then told the defendant that the map could be admitted if the defendant provided a town official who could establish that the October, 2001 map depicted the parking lot as it existed on July 12, 2003. When the defendant's attorney indicated that he could not provide such testimony, the court again sustained the state's objection.

We begin our analysis of the court's evidentiary ruling by noting that the court twice addressed the issue of the admissibility of the map of the Stamford High School parking lot. The court's initial ruling was based on the state's objection that the map was not relevant to the proceedings. The court explained that because the defendant could not establish that the October, 2001 map depicted the parking lot as it existed in July, 2003, the map was not relevant, on its face, to a material issue at trial. After the initial ruling, the court provided the defendant with the opportunity to call a witness to lay the foundation for the relevance of the map. Because the defendant did not call any such witnesses, the court again declined to allow the defendant to introduce the map into evidence.

"The admissibility of a map is similar to the admissibility of a photograph in that the trial court should

---

[9] The court stated: "I don't think [the state is] actually objecting to the map's authenticity. I think what [the state] is objecting to is that, yes, it's an authentic map of Stamford High School in October of 2001, not July of 2003. So, on that basis, I'm going to sustain the objection."

examine whether the exhibit aids the jury in understanding the evidence. . . . The trial court in ruling on admissibility is concerned with whether the map is *relevant* and whether it will assist the jury in understanding the evidence." (Emphasis added; internal quotation marks omitted.) *State* v. *White*, 64 Conn. App. 126, 133, 779 A.2d 776, cert. denied, 258 Conn. 910, 782 A.2d 1251 (2001). "Evidence is admissible only if it is relevant. . . . The trial court is given broad discretion in determining the relevancy of evidence and its decision will not be disturbed absent a clear abuse of that discretion. . . . Section 4-1 of the Connecticut Code of Evidence provides in pertinent part that evidence is relevant if it has any tendency to make the existence of any fact that is material to the determination of the proceeding more probable or less probable than it would be without the evidence. . . . Moreover, [t]he proffering party bears the burden of establishing the relevance of the offered testimony. Unless a proper foundation is established, the evidence is irrelevant." (Citations omitted; internal quotation marks omitted.) *Deegan* v. *Simmons*, 100 Conn. App. 524, 540, 918 A.2d 998, cert. denied, 282 Conn. 923, 925 A.2d 1103 (2007).

We conclude that the court did not abuse its discretion by excluding the map on the basis of relevance. In its original ruling, the court properly ruled that the map was not relevant because it did not depict the parking lot as it existed in July, 2003. The court correctly determined that the inferences that could be drawn from the map would be relevant only if the events had occurred in 2001, when the map was created, and were not relevant to the incident of July, 2003. Moreover, the defendant failed to provide any testimony or other evidence to establish that the map created in October, 2001, accurately depicted the parking lot at the time of the incident in July, 2003. Without a proper foundation that the map depicted the Stamford High School parking

lot as it existed in July, 2003, the defendant failed to establish the relevance of the map.

## III

## PROSECUTORIAL IMPROPRIETY

The defendant's final claim is that he was deprived of a fair trial because the prosecutor engaged in several instances of impropriety. Despite the defendant's failure to object to these statements at trial, his claim is reviewable in light of *State* v. *Fauci*, 282 Conn. 23, 33, 917 A.2d 978 (2007). "Once prosecutorial impropriety has been alleged, however, it is unnecessary for a defendant to seek to prevail under *State* v. *Golding*, 213 Conn. 233, 239–40, 567 A.2d 823 (1989), and it is unnecessary for an appellate court to review the defendant's claim under *Golding.*" *State* v. *Fauci,* supra, 33.

Before we examine the challenged remarks, we set forth our standard of review. "Prosecutorial [impropriety] claims invoke a two step analysis. First, the reviewing court must determine whether the challenged conduct did, in fact, constitute [an impropriety]. Second, if [an impropriety] occurred, the reviewing court must then determine if the defendant has demonstrated substantial prejudice. . . . In order to demonstrate this, the defendant must establish that the trial as a whole was fundamentally unfair and that the [impropriety] so infected the trial with unfairness as to make the conviction a denial of due process." (Citation omitted; internal quotation marks omitted.) *State* v. *Pedro S.*, 87 Conn. App. 183, 187, 865 A.2d 1177, cert. denied, 273 Conn. 924, 871 A.2d 1033 (2005).

"Because the claimed prosecutorial [impropriety] occurred during closing arguments, we advance the following legal principles. [P]rosecutorial [impropriety] of a constitutional magnitude can occur in the course of closing arguments. . . . In determining whether

such [an impropriety] has occurred, the reviewing court must give due deference to the fact that [c]ounsel must be allowed a generous latitude in argument, as the limits of legitimate argument and fair comment cannot be determined precisely by rule and line, and something must be allowed for the zeal of counsel in the heat of argument. . . . Thus, as the state's advocate, a prosecutor may argue the state's case forcefully, [provided the argument is] fair and based upon the facts in evidence and the reasonable inferences to be drawn therefrom." (Internal quotation marks omitted.) *State* v. *Farr*, 98 Conn. App. 93, 106, 908 A.2d 556 (2006).

As noted, the first step in our analysis is to determine whether any of these statements properly can be characterized as an impropriety. The defendant claims that the state acted improperly when it (1) commented on the credibility of the witnesses, (2) referred to facts that were not in evidence and (3) repeatedly used the word "nigger" in its closing statements. We conclude that none of these acts by the state was improper.

A

The defendant's first claim of impropriety is that the state improperly commented on the credibility of the testimony of several of the defendant's witnesses. We disagree.

The defendant claims that the state improperly stated that "the defense in this case consists mostly of what I'm going to call exaggerations, half-truths and outright misstatements of fact." The defendant also claims that the state improperly commented on the credibility of the defense theory that Hinds and a neighbor of his created the disturbance because they were displeased with the marching band's sponsorship of the flea market. The defendant claims that the state's comment that this theory "did not ha[ve] any credibility to it whatsoever" was improper. The defendant finally

claims that the state improperly commented on the credibility of one of the defendant's witnesses, Wayne Majeski, when it stated, "I don't think you can believe much or anything of what [Majeski] said."

We begin our review by recognizing that, "[a]s a general rule, prosecutors should not express their personal opinions about the guilt of the defendant, credibility of witnesses or evidence." *State* v. *Holliday*, 85 Conn. App. 242, 261, 856 A.2d 1041, cert. denied, 271 Conn. 945, 861 A.2d 1178 (2004). "Our jurisprudence instructs [however] that a prosecutor may comment on a witness' motivation to be truthful or to lie. *State* v. *Thompson*, 266 Conn. 440, 466, 832 A.2d 626 (2003)." *State* v. *Holliday*, supra, 261. "In *State* v. *Stevenson*, [269 Conn. 563, 584–85, 849 A.2d 626 (2004), our Supreme Court] determined that it was not improper for a prosecutor to suggest in her rebuttal argument that the police and the victims had no reason to lie but that the defendant and his friends and family did have a motive to lie. [Our Supreme Court] concluded that this was proper because it was based on the 'ascertainable motives of the witnesses' rather than the prosecutor's personal opinion. . . . [Our Supreme Court] also noted that the prosecutor's 'remarks underscored an inference that the jury could have drawn entirely on its own, based on the evidence presented.'" (Citation omitted.) *State* v. *Fauci*, supra, 282 Conn. 37.

We conclude that each of the three comments made by the state, concerning the credibility of the defendant's witnesses and the defendant's theory of defense as a whole, were proper because they were part of the state's more detailed explanation of the different motives of the witnesses to lie or to tell the truth and did not constitute the personal opinion of the prosecutor. The state went to great lengths in its closing argument to detail the reasons why the defendant, Majeski and Surkey may not have had a motive for telling the

truth and why the state's witnesses, especially Hinds and his neighbor, had motives for being truthful.[10] With two differing variations of the events of July 12, 2003, we cannot say that it was improper for the state to argue, on the basis of permissible inferences, that its witnesses were to be believed and the defendant's witnesses were not.

## B

The defendant's second claim of prosecutorial impropriety is that the prosecutor improperly stated during closing argument that "Mary Surkey never called the

[10] The prosecutor's statement regarding the veracity of the witnesses' testimony was followed by a comparison of the two different versions of how the events happened. After this comparison, the prosecutor stated: "Now, the other thing is—I want you to look at is, if the state's witnesses didn't tell the truth, what motive did they have for not telling the truth? Why would they come in here and make misstatements under oath? What would be their motive?" After having commented on the motives that the state's witnesses had to tell the truth, the prosecutor then stated: "And, on the other hand, why do I ask you to disbelieve the defendant's witnesses? . . . Nobody likes to get arrested and, when they get arrested, they don't like to be convicted. And so, a defendant who's on trial has a built-in motive for not telling the truth—that is, their interest in the outcome of the trial. And the other witnesses—why would they not be truthful, and the state's argument is that they're friends."

The prosecutor then continued by stating, "Now, I've already mentioned about the plot to get rid of the marching band. I don't think that that has any credibility to it whatsoever, but that's your determination to make—whether you credit that argument or not. It's my opinion that really doesn't matter. It's your opinion that matters."

Additionally, the state's comment regarding Majeski was made in the context of explaining why his friendship with the defendant gave him motivation to lie: "Now, Majeski insists he saw the whole thing, but I don't think you can believe much or anything of what Wayne Majeski said, and I—forget that I said I. I don't believe that the evidence would allow you to believe what Wayne Majeski said. And the evidence is that Wayne Majeski got on the witness stand and, among other things, swore under oath that—swore under oath that the only time that [the defendant] had ever been to his house was in the summer of 2003 after the flea market. That was the only time." The state then contrasted the statement that Majeski had seen the defendant only once since the flea market with testimony from which the jury could infer otherwise.

police." The defendant's argument amounts to a claim that the state submitted unsworn testimony to the jury. We disagree.

In reviewing the defendant's claim that the state improperly presented unsworn testimony to the jury during its closing argument, we recognize that a prosecutor properly may ask the jury to draw reasonable inferences on the basis of the evidence at trial. *State v. Farr*, supra, 98 Conn. App. 110. "Our cases indicate [however] that improper unsworn testimony generally contains the suggestion of secret knowledge . . . on the part of the prosecutor." (Citation omitted; internal quotation marks omitted.) *State v. Holliday*, supra, 85 Conn. App. 260.

We conclude that it was not improper for the state to suggest to the jury that Surkey never called the police. Rather than suggesting secret knowledge on the part of the prosecutor, the state was merely asking the jury to draw a reasonable inference from the evidence.[11]

### C

The defendant's final claim of prosecutorial impropriety is that the state's repeated use of the word "nigger" in its closing argument was meant to inflame the jury and therefore unfairly prejudiced the defendant. The defendant argues that the very use of the word is so provocative that he could not have received a fair trial when it was repeated by the state during its closing argument. We are not persuaded.

"A prosecutor may not appeal to the emotions, passions and prejudices of the jurors. . . . When the prosecutor appeals to emotions, he invites the jury to decide the case, not according to a rational appraisal of the

---

[11] After suggesting that Surkey did not call the police, the state gave a detailed explanation of why the evidence that was presented supported such an inference.

evidence, but on the basis of powerful and irrelevant factors which are likely to skew that appraisal." (Internal quotation marks omitted.) *State* v. *Warholic*, 278 Conn. 354, 376, 897 A.2d 569 (2006). Furthermore, "[a]s the state's representative, a prosecutor must take great care to avoid using language in argument that is susceptible to an improper racial connotation. Such rhetoric has no place in the courtrooms of this state." *State* v. *Pouncey*, 241 Conn. 802, 816, 699 A.2d 901 (1997).

Although the defendant claims that the state's use of the word "nigger" during the closing arguments was improper, our review of the record does not lead us to the same conclusion. In its closing argument, the state used the word only when it was referring to the testimony of witnesses who stated that they had heard the word used. The use of the word in reference to the testimony of a number of witnesses constituted proper discussion of the relevant evidence presented at trial. We are not persuaded that it unfairly prejudiced the jury in any way. We conclude that the state's use of the word during closing argument was not improper, especially when the defendant's use of the word was an important component of proving the defendant's intent.

The judgment is affirmed.

In this opinion the other judges concurred.