## CICERO BOOKER, JR. *v.* MICHAEL J. JARJURA ET AL.*
## (AC 29940)
## (AC 29941)

Harper, Alvord and Foti, Js.

---

* According to the Superior Court judgment file in this matter, although the name of Michael J. Jarjura, the mayor of the city of Waterbury, appears in the caption of this case and on the "Application for Hearing on Writ of Quo Warranto," his name was not on the summons and he was not in fact served or intended as a party in this action. Jarjura was properly a party in another action previously filed by the same plaintiff challenging other appointments that he had made. Accordingly, for convenience sake, the caption of this appeal is consistent with the caption of the case as indicated in the judgment file.

1

Argued October 15, 2009—officially released March 23, 2010

*Frederick W. Krug,* for the appellant-appellee (plaintiff).

*Howard K. Levine,* for the appellees-appellant (defendant Maria Giordano et al.).

*Opinion*

FOTI, J. These consolidated appeals concern an action brought by the plaintiff, Cicero Booker, Jr., the minority leader of the board of aldermen of the city of Waterbury, for quo warranto and mandamus. The plaintiff challenged the propriety of certain appointments of city electors to various boards and commissions by the mayor of Waterbury, Michael J. Jarjura, and the zoning commission of the city of Waterbury.[1] The plaintiff also sought an injunction directing the zoning commission to make appointments to minority positions on the zoning commission only from persons named on a list provided by the minority leader of the board of aldermen. On November 27, 2007, the plaintiff filed a second amended, verified complaint against the defendants Dov Braunstein, Nancy Howse, Maria Giordano and the members of the zoning commission.[2] The first count was a claim for quo warranto against Braunstein and Howse; however, the plaintiff subsequently withdrew the claim as to Howse.[3] Count two was a claim for quo warranto against Giordano. The third count was a claim for mandamus against the members of the zoning commission. By memorandum of decision filed May 2, 2008, the trial court found in favor of the plaintiff on count one, granted the application for a writ of quo warranto as to Braunstein and ordered him ousted from his position on the inland wetlands

---

[1] Jarjura is not a defendant in the present case even though his name appears in the caption. He was, however, a defendant in a separate action, *Booker* v. *Jarjura*, Superior Court, judicial district of Waterbury, Docket No. CV-06-4011301-S (April 30, 2007) (43 Conn. L. Rptr. 405). No appeal was taken from the judgment in that case. That action is, however, inextricably intertwined with the action underlying this appeal. The trial court in this action referred to that case as *Booker I*, and for consistency, we use that reference as well throughout this opinion.

[2] Also named as defendants were John Egan, Joseph D'Orso, Guiseppe Pisani, Stephen Mannetti, Ernest Brunelli and Paul K. Pernerewski, Jr.

[3] Braunstein, a Republican, had been appointed by Jarjura, a Democrat, to Waterbury's inland wetlands and watercourses commission.

and watercourses commission of the city of Waterbury. The court, however, denied the plaintiff's application for a writ of quo warranto as to Giordano, as well as the claim for a writ of mandamus against the members of the zoning commission. On May 19, 2008, the plaintiff appealed from the court's judgment in favor of Giordano and the members of the zoning commission on counts two and three of the complaint (AC 29940). On May 21, 2008, Braunstein appealed from the court's judgment in favor of the plaintiff on count one (AC 29941).[4] We affirm the judgment of the trial court.

The following factual and procedural history of these consolidated appeals is pertinent to their resolution. On December 1, 2005, the plaintiff, a member of the Independent political party and a recently elected member of the board of aldermen, was elected to the minority leader position on the board as provided for in the Waterbury charter. Pursuant to the charter, the mayor has the duty to appoint city electors, subject to the approval of the board of aldermen, to various boards and commissions.[5] On January 30, 2006, the plaintiff submitted to Jarjura a list of individuals he believed eligible for appointment to various boards and commissions.[6] On February 24, 2006, Jarjura submitted to the

[4] On February 11, 2009, this court granted the plaintiff's December 30, 2008 motion to consolidate AC 29940 and AC 29941.

[5] Chapter 4, § 4-2, of the Waterbury charter provides in relevant part: "It shall further be the duty of the Mayor . . . (b) to fill by appointment vacancies in offices, including, but not limited to . . . boards and commissions in all cases in which the power of appointment is vested in the Mayor, unless otherwise specifically set forth in this Charter . . . ."

Chapter 3, § 3A-2, of the Waterbury charter provides in relevant part: "The Board of Aldermen shall have the following powers . . . (e) to reject, by an affirmative vote of ten (10) members, within thirty (30) days of submission, all appointments made by the Mayor pertaining to . . . appointive positions, boards and commissions required by this Charter or Ordinances . . . ."

[6] Chapter 4, § 4-2 (b) (1), of the Waterbury charter provides in relevant part that "[n]otwithstanding any other provision of the Charter. . . the Mayor . . . shall make no appointment of a minority party member of any board for which provision is made in said Charter to be filled by appointment

board of aldermen a list of individuals for appointment to various boards and commissions, including individuals who were to serve as minority party members. Jarjura's list included individuals for minority party member appointment to boards and commissions who were not on the list the plaintiff had provided, including Braunstein.[7]

On May 23, 2007, there was a minority seat vacant on the zoning commission. As of that date neither Jarjura nor the board of aldermen had acted to fill the vacancy on the zoning commission. On that date, pursuant to the charter,[8] the members of the zoning commission voted unanimously to appoint Giordano, a

by the Mayor except from a list of those eligible for appointment submitted by said minority leader of the Board of Aldermen. The Mayor shall notify said minority leader of the time or dates for the making of all appointments of such minority members, and the minority leader shall thereupon and prior to the time for making such appointments, submit to the Mayor a list of those whom he shall select as eligible for such appointments which shall be made up of not less than twice the number to be appointed. No minority member of any such board shall be eligible to act as such unless his name shall be one of those listed by such minority leader in accordance with the provisions hereof."

[7] Also included on Jarjura's list for appointment were Lisa Mason, Nancy Carmody, Vincent Russo, Giovanni Perugini and Jose Diaz. Because Jarjura had proposed to appoint those individuals to minority seats on various boards and commissions even though they did not appear on the plaintiff's January 30, 2006 list, the plaintiff brought an action for quo warranto against them in *Booker I*. See footnote 1 of this opinion. At that time, the plaintiff also brought a mandamus action against Jarjura, seeking both a temporary and permanent injunction requiring him as mayor and pursuant to the charter, to make appointments to minority positions on boards and commissions only from among those people named on a list submitted by the minority leader of the board of aldermen. In the case underlying this appeal, the plaintiff contended that he overlooked Braunstein's appointment when he brought the quo warranto action in *Booker I*, even though Braunstein's appointment was contemporaneous to those named in that action.

[8] Chapter 4, § 4-2 (b) (2), of the Waterbury charter provides in relevant part: "[I]f the Mayor fails to announce the appointment of a replacement member in the event of a vacancy on said board or commission: (i) during the first six (6) months of the term of office, within ninety (90) days following the effective date of that vacancy or (ii) during the remainder of the term of office, within sixty (60) days following the effective date of that vacancy,

Republican, to the vacant seat. Giordano did not appear on the plaintiff's list of recommended minority party members for appointment to the zoning commission. Other facts relevant to these appeals will be set forth as necessary. We now address each appeal in turn.

I

AC 29940

In this appeal, the plaintiff appeals from the judgment of the court denying his application for a writ of quo warranto as to Giordano and his claim for mandamus as to the members of the zoning commission. We will discuss each of the plaintiff's claims in turn.

A

Quo Warranto

"A complaint in the nature of a quo warranto may be brought [w]hen any person . . . usurps the exercise of any office . . . [and] the Superior Court may proceed . . . to punish such person . . . for such usurpation, according to the course of the common law and may proceed therein and render judgment according to the course of the common law. . . . A quo warranto proceeding under the common law lies only to test the defendant's right to hold office de jure. . . . In such an action, the burden is on the defendant to show, by a preponderance of the evidence, a complete title to the office in dispute. . . . The title to be challenged in a quo warranto proceeding must be to a public office." (Citations omitted; internal quotation marks omitted.)

then the Board of Aldermen shall fill the vacancy within sixty (60) days thereafter by a majority vote of those present. If the Board of Aldermen fails to fill the vacancy during the sixty (60) day period, then the remaining members of the board or commission for which the vacancy exists shall fill the vacancy by appointment. Said appointments are subject to the requirements of the General Statutes pertaining to minority party representation and this Charter."

*Dumais* v. *Underwood,* 47 Conn. App. 783, 788, 707 A.2d 333, cert. denied, 244 Conn. 918, 714 A.2d 4 (1998); see also General Statutes § 52-491.[9] In this claim, the plaintiff argues that the court incorrectly interpreted the Waterbury charter as not restricting those appointments to minority seat vacancies made by board and commission members, pursuant to chapter 4, § 4-2 (b) (2) of the charter; see footnote 8 of this opinion; to those individuals on the minority leader's list. Essentially, the plaintiff claims that the restriction found in § 4-2 (b) (1) of the charter, which reads: "No minority member of any such board shall be eligible to act as such unless his name shall be one of those listed by such minority leader in accordance with the provisions hereof"; see footnote 6 of this opinion; applies to all minority member appointments and not merely those made by the mayor. We disagree.

The plaintiff's claim requires us to interpret the Waterbury charter. We first address the appropriate standard of review. As with any issue of statutory construction, the interpretation of a charter presents a question of law, over which our review is plenary. See *Lash* v. *Freedom of Information Commission,* 116 Conn. App. 171, 186, 976 A.2d 739, cert. granted on other grounds, 293 Conn. 931, 980 A.2d 915 (2009). When construing a statute, "[o]ur fundamental objective is to ascertain and give effect to the apparent intent of the legislature. . . . In other words, we seek to determine, in a reasoned manner, the meaning of the statutory language as applied to the facts of [the] case, including the question of whether the language actually does

[9] General Statutes § 52-491 provides in relevant part: "When any person . . . usurps the exercise of any office . . . the Superior Court may proceed, on a complaint in the nature of a quo warranto, to punish such person . . . for such usurpation, according to the course of the common law and may proceed therein and render judgment according to the course of the common law."

apply. . . . In seeking to determine that meaning, General Statutes § 1-2z directs us first to consider the text of the statute itself and its relationship to other statutes. If, after examining such text and considering such relationship, the meaning of such text is plain and unambiguous and does not yield absurd or unworkable results, extratextual evidence of the meaning of the statute shall not be considered." (Internal quotation marks omitted.) *Canterbury* v. *Deojay*, 114 Conn. App. 695, 716, 971 A.2d 70 (2009).

The plaintiff argues that the limitation found in § 4-2 (b) (1) cautioning that "[n]o minority member of any such board shall be eligible to act as such unless his name shall be one of those listed by such minority leader in accordance with the provisions hereof," not only applies to appointments to minority vacancies made by the mayor but also to such appointments made by the members of boards or commissions pursuant to § 4-2 (b) (2). See footnote 8 of this opinion. This is so, the plaintiff contends, because the last sentence of § 4-2 (b) (2) declares that such appointments are subject to "this [c]harter." This term, the plaintiff continues, read in conjunction with the restriction found in § 4-2 (b) (1), requires that *all* appointments to minority vacancies must come from the list of minority party members provided by the minority leader of the board of aldermen. The plaintiff concludes that this is the only logical and reasonable interpretation of the charter provisions regarding appointment of minority party members to boards or commissions because any other conclusion would create the "anomalous situation in which different eligibility standards would apply, depending on whether the appointment is made by the mayor or by the members of a board or commission." Furthermore, the plaintiff cautions, a contrary interpretation in which such appointments are not restricted by the requirement that they appear on the minority

leader's list would allow the mayor to circumvent those very requirements "by not making minority appointments and then having political allies on boards or commissions with vacant minority seats fill those seats without regard to the minority leader's list." Finally, the plaintiff suggests that such a construction would thwart the purpose of limiting appointments to minority vacancies to persons named on the minority leader's list and create an inharmonious scheme of appointing electors to minority vacancies on boards and commissions.

After a careful review of the charter as a whole,[10] we conclude that the language of § 4-2 (b) (1) is strictly a limitation on the appointment power of the mayor and as such does not confine appointments to minority seat vacancies, made pursuant to § 4-2 (b) (2), to individuals present on the minority leader's list. A closer look at chapter four of the Waterbury charter supports this conclusion. We first note that chapter four of the Waterbury charter is simply titled "The Mayor,"[11] and § 4-2 of that chapter, headed "Duties," starts with the phrase: "It shall further be the duty of the Mayor," with ensuing subsections that delineate the mayor's various duties, as well as certain limitations. Section 4-2 (b) (1) is headed: "Appointment of Minority Party Members of Boards." This subdivision clearly creates a mandatory limitation on the mayor's power to appoint minority

[10] See *Broadnax* v. *New Haven*, 270 Conn. 133, 161, 851 A.2d 1113 (2004) ("In arriving at the intention of the framers of [a] charter the whole and every part of the instrument must be taken and compared together. In other words, effect should be given, if possible, to every section, paragraph, sentence, clause and word in the instrument and related laws." [Internal quotation marks omitted]).

[11] "The title . . . of legislation [is], while not conclusive, [a] valuable [aid] to construction." *Peck* v. *Jacquemin*, 196 Conn. 53, 68 n.17, 491 A.2d 1043 (1985); but see *Corneroli* v. *D'Amico*, 116 Conn. App. 59, 67 n.2, 975 A.2d 107 (if language of statute clear and not subject to interpretation, titles are of less significance in construction), cert. denied, 293 Conn. 928, 980 A.2d 909 (2009).

party members to vacant minority seats on city boards and commissions. The "Mayor . . . shall make no appointment of a minority party member of any board *for which provision is made in said Charter to be filled by appointment by the Mayor* except from a list of those eligible for appointment submitted by said minority leader of the Board of Aldermen." (Emphasis added.) Waterbury Charter, c. 4, § 4-2 (b) (1). This restriction, by its unambiguous terms, applies only to minority vacancies that, as the charter declares, are "to be filled by appointment by the Mayor . . . ." Id. Moreover, nowhere in § 4-2 (b) (1) is there mention of the power of appointment to minority seat vacancies by the board of aldermen or boards or commissions.

Notwithstanding that "[s]aid appointments [made pursuant to § 4-2 (b) (2)] are subject to the requirements of . . . this Charter," we cannot agree that this language makes applicable the restriction found in § 4-2 (b) (1) that "[n]o minority member of any such board shall be eligible to act as such unless his name shall be one of those listed by such minority leader in accordance with the provisions hereof" to those appointed under § 4-2 (b) (2). It would be illogical to conclude that restrictions expressly placed on the mayor's power of appointment in § 4-2 (b) (1) also are applicable to appointments made pursuant to § 4-2 (b) (2) in the absence of any mention of the appointment power of the board of aldermen or boards or commissions in the former subdivision or any restrictions on minority appointments in the latter. On the basis of our review of the charter, it is clear that the language in § 4-2 (b) (2) is referring to other provisions that delineate generally, *regardless of party affiliation*, who may serve on various boards and commissions.[12] Therefore,

___

[12] For example, chapter 6, § 6A-5, of the Waterbury charter provides: "Except as otherwise provided by ordinance, no person may serve on a board or commission unless such person is an elector of the City. If any person who is a member of a board shall move from the City, such person's membership on such board or commission shall immediately terminate."

we conclude that the court properly denied the plaintiff's application for a writ of quo warranto against Giordano, and this claim fails.

## B

## Mandamus

"[M]andamus is an extraordinary remedy to command the performance of a duty and . . . the burden rests on the party seeking performance of the duty to establish his legal right to its performance." *Ross* v. *Planning & Zoning Commission*, 118 Conn. App. 55, 63, 982 A.2d 1084 (2009). At trial, the court denied the plaintiff's application for a writ of mandamus against the members of the zoning commission. He sought a temporary and permanent injunction requiring members of the zoning commission to make minority appointments to the zoning commission pursuant to § 4-2 (b) (2) only from the list of minority party members provided by the minority leader of the board of aldermen. On appeal, the plaintiff claims that the charter requires that *all* appointments to minority vacancies must come from the list of minority party members provided by the minority leader of the board of aldermen.[13] For the reasons set forth in part I A of this opinion, this claim fails.

## II

## AC 29941

In this appeal, Braunstein appeals from the court's finding him ineligible to act as a member of the inland wetlands and watercourses commission and, therefore, granting the plaintiff's application for quo warranto; see part I A of this opinion; as to him and ordering him

___

[13] The plaintiff's arguments in support of this claim mirror those made in support of his claim in part I A of this opinion.

ousted from his position. We affirm the judgment of the trial court.

The following additional facts will aid in our analysis of Braunstein's claims.[14] On September 7, 2006, the plaintiff, in a previous action, *Booker I*; see footnote 1 of this opinion; filed a two count, verified complaint for mandamus against Jarjura and quo warranto against five individuals appointed to various boards and commissions by Jarjura. The central issue in *Booker I* concerned the interpretation of § 4-2 (b) (1) of the city charter. Specifically at issue was the phrase "minority party member," which had been added to § 4-2 (b) (1) as part of a 2002 revision. The defendants argued that under the clear and unambiguous language of the revised charter, the mayor was limited to the minority leader's list *only* if he wanted to appoint someone to a board or commission who belonged to the same political party as the minority leader.[15] This was so because in the 2002 revision, the word "party" was added to § 4-2 (b) (1) so that it now reads, "the Mayor of said City shall make no appointment of a minority *party* member of any board . . . ." (Emphasis added.) The defendants asserted that because none of the defendant board and commission members belonged to the same political party as the plaintiff, they rightfully held their positions.[16] The plaintiff argued that when making minority appointments to boards and commissions, the mayor

[14] Because the court, in ruling against Braunstein, in this case, expressly adopted its reasoning from *Booker I*, a comprehensive account of that case is required.

[15] At the time, the board of aldermen consisted of nine Democrats, four members of the Independent party and two Republicans. The plaintiff was a member of the Independent party. Each of the defendant board and commission members was a member of the Republican party.

[16] The defendants also argued in *Booker I* that if the court did not adopt the defendants' interpretation of § 4-2 (b) (1), then that provision was unconstitutionally vague and, therefore, should be void. The court found that § 4-2 (b) (1) was not unconstitutionally vague.

may appoint only individuals who appear on the minority leader's list and that only those individuals are eligible to serve on the boards and commissions as minority members.

On April 30, 2007, by memorandum of decision, the court granted the writ of mandamus "with regard to boards and commissions that can have majority representation, and therefore, fall under the purview of § 4-2 (b) (1) [and ordered] Jarjura . . . to appoint people to be minority members of these boards and commissions only if they are members of the 'minority party' as defined by the court and on the minority leader's list as recommended for appointment for that particular board or commission." In response to the plaintiff's quo warranto action, the court also ousted three of the five defendant board and commission members "because they [were] members of the 'minority party' as defined by this court, and they [did] not appear on the plaintiff's list as recommended for the positions for which they were appointed."[17]

The court supported its conclusions on the basis of its interpretation of the legislative intent of the 2002 charter revision commission when it inserted the word "party" into § 4-2 (b) (1). After concluding that § 4-2 (b) (1) was "unclear and ambiguous," the court reviewed a transcript of the charter revision commission's question and answer session at its June 19, 2002 public hearing. On the basis of that review, the court concluded that "the meaning of the term 'minority party members,' as stated in § 4-2 (b) (1), refers to the nonmajority political parties represented on the board of aldermen." The

---

[17] Those three individuals were Lisa Mason, Giovanni Perugini and Jose Diaz. See footnote 7 of this opinion. The court, however, ruled that Nancy Carmody and Vincent Russo met the requirements to serve on their respective commissions because § 4-2 (b) (1) does not apply to those commissions, as no one political party can hold the majority of seats on them.

court continued, "[i]n the present case, only Republicans and Independents are 'minority party members.' [Moreover] pursuant to § 4-2 (b) (1), when making minority appointments to boards and commissions, the mayor is confined to appointing people who appear on the minority leader's list as 'minority party members.' Should the mayor attempt to make a minority appointment of a member of the 'minority party' and that person does not appear as designated for such appointment on the [minority leader's] list, then that person will not be eligible to serve as per the last sentence of § 4-2 (b) (1), which prohibits minority members of boards or commissions from serving unless they appear on the minority leader's list. In addition, should the mayor attempt to make a minority appointment of an individual not belonging to the 'minority party,' as defined by the court, then that person will be ineligible to serve regardless of whether that name appears on the minority leader's list." *Booker I* was not appealed.

At trial in this case, the plaintiff essentially argued that because Braunstein was appointed to his position on the inland wetlands and watercourses commission from the same February 24, 2006 list that Jarjura submitted and from which the five *Booker I* defendant board and commission members were appointed, the reasoning of *Booker I* applied, and, therefore, he did not rightfully hold his position. Braunstein first argued that the ruling in *Booker I* could not apply to him because he was not a party to that action. He further argued that the rule announced in *Booker I* was incorrect in that it was unworkable, contradicted our Supreme Court precedent and that the trial court's interpretation of the charter was improperly founded on comments made by a member of the public at the June 19, 2002 public hearing. Braunstein also contended that by its plain language, the terms of § 4-2 (b) (1) did not apply to his appointment because although he was appointed to a

commission, that subdivision only applies to appointments to boards and then only to boards for which provision is made in the charter. After a hearing on December 10, 2007, the court, by memorandum of decision filed May 2, 2008, granted the plaintiff's application for quo warranto as to Braunstein and, therefore, ordered him ousted from his position on the inland wetlands and watercourses commission. The court expressly based its ruling on its "interpretation in *Booker I* of the legislative intent of the 2002 charter revision commission in inserting the word 'party' into § 4-2 (b) (1)."

On appeal, Braunstein makes four specific claims. First, he claims that the court improperly refused to consider arguments he made that had not been made by the defendants in *Booker I*.[18] Alternatively, Braunstein contends that if in actuality the court had addressed those claims in reaching its decision, the court improperly (1) concluded that § 4-2 (b) (1), by its unambiguous terms, applies to commissions as well as boards; (2) relied on the *Booker I* interpretation of "minority party member" because that interpretation was (a) unworkable and in contravention to our Supreme Court precedent and (b) incorrectly made on the basis of comments from a member of the public given at a public hearing of the charter revision commission; and (3) concluded that the term "minority party members" was not unconstitutionally vague. We now address each of Braunstein's claims in turn. Additional facts will be set forth as necessary.

[18] In its memorandum of decision, the court in this case stated that it would not consider Braunstein's arguments "pertaining to the 2002 charter revision commission's intent in inserting the word 'party' into § 4-2 (b) (1) and the argument that § 4-2 (b) (1) applies to boards but not commissions [because they] could have been raised in *Booker I* but [were] not . . . ." The court, however, further stated that "even if the entire factual situation in [this case] was a matter of first impression to this court, this court would still rule in the same manner and grant the [application] for a writ of quo warranto as it pertains to Braunstein."

## A

Braunstein's first claim requires little discussion. His contention that the court improperly refused to consider arguments that he had made at trial that had not been made by the defendants in *Booker I* is undermined by the court's statement that "even if the entire factual situation in [this case] was a matter of first impression to this court, this court would still rule in the same manner and grant the [application] for a writ of quo warranto as it pertains to Braunstein." This statement indicates that the court had, indeed, sufficiently considered those arguments. Cf. *In re Emerald C.*, 108 Conn. App. 839, 852 n.9, 949 A.2d 1266 ("[w]e have repeatedly held that this court will not consider claimed errors on the part of the trial court unless it appears on the record that the question was distinctly raised at trial and *was ruled upon and decided by the court adversely to the appellant's claim*" [emphasis in original; internal quotation marks omitted]), cert. denied, 289 Conn. 923, 958 A.2d 150 (2008). This is the exact position Braunstein apparently adopts in his brief to this court when he stated that "[i]t appears . . . that the trial court did answer [those] arguments, and the parties [submitting this consolidated brief] are proceeding on that basis."[19] Because we conclude that the court sufficiently considered Braunstein's arguments, this claim has no merit.

[19] Braunstein also argues that the court misapplied the law of the case doctrine. See *General Electric Capital Corp. of Puerto Rico* v. *Rizvi*, 113 Conn. App. 673, 681, 971 A.2d 41 (2009). We disagree. Although the court based its ruling against Braunstein on its "interpretation in *Booker I* of the legislative intent of the 2002 charter revision commission in inserting the word 'party' into § 4-2 (b) (1)," the court clearly was adopting the reasoning it had used in *Booker I* and not treating that decision as the law of the case. See id.

Braunstein also frames this claim as an improper application of the doctrine of collateral estoppel or issue preclusion. See *Labow* v. *Rubin*, 95 Conn. App. 454, 461–63, 897 A.2d 136, cert. denied, 280 Conn. 933, 909 A.2d 960 (2006). Because we conclude that the court did address the arguments put forth by Braunstein, this argument has no merit.

B

Next, Braunstein claims that the court improperly concluded that § 4-2 (b) (1), by its unambiguous terms, applies to his appointment to the inland wetlands and watercourses commission. Specifically he argues that by the plain language of § 4-2 (b) (1), the limitation concerning the minority leader's list applies only to boards, not commissions, and then only to boards for which provision is made in the charter. See footnote 6 of this opinion. Braunstein contends that the inland wetlands and watercourses commission is a commission that exists pursuant to § 31.005 of an omnibus ordinance that concerned the implementation of charter provisions to appointive boards and commissions as required by § 6C-1 of the charter[20] and thus is distinct from "boards for which provision is made in the charter . . . ." We disagree.

We note that because Braunstein's claim involves the interpretation of the Waterbury charter, our standard of review is plenary. See *Lash* v. *Freedom of Information Commission,* supra, 116 Conn. App. 186; see also part I A of this opinion. Because, after considering the text of § 4-2 (b) (1) and its relationship to other provisions in the charter, we conclude that it is unclear and ambiguous with respect to the question of whether the limitations it places on minority appointments are restricted only to boards for which provision is made in the charter and not other such boards or commissions. We, therefore, turn to extratextual evidence in order to determine

[20] Chapter 6, § 6C-1, of the Waterbury charter provides: "The Board of Aldermen shall adopt ordinances setting forth the organizational structure and powers of the boards and commissions set forth in Part C . . . of this Chapter." Part C of chapter six specifically creates several boards and commissions, the inland wetlands and watercourses commission not among them. Those included are, among others, the board of commissioners of public health, § 6C-2; the board of park commissioners, § 6C-3; the city plan commission, § 6C-4; the board of police commissioners, § 6C-5; and the zoning commission, § 6C-7.

the meaning of the statutory language under these circumstances. See *Canterbury* v. *Deojay*, supra, 114 Conn. App. 716; General Statutes § 1-2z.

Section 4-2 (b) (1) first appeared in the charter as § 2152 in 1947 and remained unchanged until 2002 when, after a charter revision, it was recodified into its present form. See Spec. Acts, No. 108, § 2 (1947). The only change made in that 2002 revision and recodification was the insertion of the word "party," so that it now reads, "the Mayor of said City shall make no appointment of a minority party member of any board . . . ."[21] Waterbury Charter, c. 4, § 4-2 (b) (1). The remaining text of the section was left unchanged. That is to say, from its inception through to its revision and recodification and its present incarnation, the restriction in the charter on the mayor's power of appointment to minority seats has always referred to appointments to "boards."

Our Supreme Court, in *State ex rel. Giusti* v. *Barbino*, 170 Conn. 113, 365 A.2d 408 (1976), had the opportunity, in a different context, to interpret then § 2152 of the charter. In that case, the minority leader of the board of aldermen submitted to the mayor a list of names of persons eligible for minority party appointment to several boards and commissions, including the commission on aging, the civil service commission and the zoning commission. Id., 113–14. That list also matched the candidate to the board or commission to which they were candidates for appointment. Although the mayor did appoint from that list, he cross matched some of the appointees so that they would serve on boards or commissions for which they were not recommended by the minority leader. We note that not only were the appointments—made pursuant to the virtually identical

---

[21] The word "party" was also inserted into the heading of § 4-2 (b) (1) so that it now reads: "Appointment of Minority Party Members of Boards."

predecessor of the provision at issue here—made to *commissions*, but that that circumstance was expressly stated as part of our Supreme Court's interpretation of that provision in an officially published decision. We conclude that under these circumstances, we are entitled to presume that the 2002 charter revision commission revised and recodified § 2152 into § 4-2 (b) (1) with the knowledge of that existing precedent and the circumstances underlying the claims made, as well as the effect its own action or nonaction may have had on them. Cf. *Achillion Pharmaceuticals, Inc.* v. *Law*, 291 Conn. 525, 535, 970 A.2d 57 (2009) ("[t]he legislature is presumed to be aware and to have knowledge of all existing statutes and the effect which its own action or nonaction may have on them" [internal quotation marks omitted]); see also *Mack* v. *Saars*, 150 Conn. 290, 298, 188 A.2d 863 (1963) ("[i]t is a well-recognized rule of statutory construction that the legislature is presumed to know all the existing statutes, the judicial interpretation of them, and the effect that its action or nonaction will have on them"). As noted previously, although the charter revision commission is presumed to have been aware of the mayor's practice of making minority appointments to commissions as well as boards from a list provided by the minority leader of the board of aldermen as required under § 2152, the only change the charter revision commission made was to add the word "party" after "minority" in both the text and the title of that section. Although we are aware that the charter revision commission's inaction is not necessarily an affirmation of the practice under review, we also presume that the charter revision commission was aware of that practice as exposed in *State ex rel. Giusti* v. *Barbino*, supra, 170 Conn. 113, and that its subsequent nonaction may be understood as a validation of that practice. See, e.g., *Mahon* v. *B.V. Unitron Mfg., Inc.*, 284 Conn. 645, 665, 935 A.2d 1004 (2007).

Absent any evidence to the contrary, we, therefore, conclude that the charter revision commission intended for appointments of minority party members under § 4-2 (b) (1) to include such appointments to boards *and* commissions.

### C

Next, Braunstein claims that the court improperly relied on its *Booker I* interpretation of "minority party member" because that interpretation was unworkable and in contravention of our Supreme Court precedent, and was incorrectly made on the basis of comments from a member of the public given at a public hearing of the charter revision commission. We disagree.

Because Braunstein's claim involves the interpretation of the Waterbury charter, our standard of review is plenary. See *Lash* v. *Freedom of Information Commission*, supra, 116 Conn. App. 186; see also part I A of this opinion. On the basis of our review of the charter, we conclude that the court was correct in determining that the term "minority party member" is unclear and ambiguous. When the language of a statute is not plain and unambiguous, we "look for interpretive guidance to the legislative history and circumstances surrounding its enactment [and] to the legislative policy it was designed to implement . . . ." (Internal quotation marks omitted.) *Fedus* v. *Planning & Zoning Commission*, 278 Conn. 751, 756, 900 A.2d 1 (2006). After careful consideration of the parties' arguments and our review of the record, including the testimony of Paul K. Pernerewski, Jr.,[22] as well as the available legislative history,[23]

---

[22] Pernerewski testified at the December 10, 2007 hearing. He was the chairman of the 2002 charter revision commission and the majority leader on the board of aldermen at the time of trial, as well as a member of the zoning commission.

[23] Counsel for Braunstein conceded both to the trial court in this case and at oral argument before this court that there was no extant legislative history with regard to the passage of § 2152. Moreover, our research reveals that the transcript of the exchange that occurred at the June 19, 2002 public hearing on the charter revision that the court relied on in *Booker I* is the

we conclude that the court was correct in determining that the meaning of the term "minority party members," as used in § 4-2 (b) (1), refers to the nonmajority political parties represented on the board of aldermen. Moreover, this result is not unworkable nor, as our research reveals, in contravention of *any* applicable precedent.

The record reflects that, at the June 19, 2002 public hearing, Lawrence DePillo, a Waterbury community activist, had an opportunity to address the charter revision commission. Present at that meeting were Pernerewski, the chairman of the charter revision commission, along with seven of its other eight members. Also present and participating were Dennis M. Buckley and Steven G. Mednick, attorneys who the city had hired to work with the charter revision commission. Buckley was hired to act as a consultant to the charter revision commission, and Mednick was hired as special counsel to the charter revision commission. At the outset, Pernerewski stated that the purpose of the meeting was "to meet with [members of the public] who have some questions and explain what [the charter revision commission] did so that whether you agree with what [the charter revision commission] did or disagree with what [the charter revision commission] did, at least you'll understand what [the charter revision commission] did . . . ."

DePillo raised the issue of past mayoral abuses in minority appointments to boards and commissions. Essentially, DePillo was concerned about the appointment of unaffiliated electors—that is, electors with no party affiliation—to seats on boards or commissions and, as a result, by not filling them with members of the majority party, the mayor thereby maintained his or her ability to appoint the maximum allotted majority

full extent of the available legislative history concerning the insertion of the word "party" into § 4-2 (b) (1).

members to those boards or commissions. A discussion ensued among DePillo, Pernerewski, Laurie Singer-Russo, an alderman and member of the charter revision commission, as well as Buckley and Mednick. Buckley pointed out that in such a circumstance, the minority leader's right to designate minority members for vacancies would be reduced by the mayor's actions. Mednick responded that the charter revision commission had not yet modified the charter in order to address that issue. He then suggested that "[o]ne thing I would do that we didn't do because we really didn't focus on this section is, I make clear that it's [m]inority [p]arty members on [b]oards as opposed to [m]inority [m]embers of [b]oards—using the current language is, [m]inority [m]embers—[we're] talking about parties here."

Pernerewski testified at trial concerning the process of the charter revision in general, as well as the revision and recodification of § 4-2 (b) (1) specifically. Pernerewski testified that until the June 19, 2002 hearing, other than changing the numbering of that provision, the charter revision commission intentionally had left that provision unchanged. Moreover, he testified that prior to the June 19, 2002 public hearing, the charter revision commission had chosen not to revise portions of the charter that, according to his testimony, like § 4-2 (b) (1) pertained to the "political process" surrounding the charter rather than the "governmental process . . . ." In other words, it was not until after the discussion at the public hearing took place, as detailed previously, that the charter revision commission decided to revise § 4-2 (b) (1) to include the word "party."

We find compelling to our conclusion that the court properly interpreted the legislative intent behind the charter revision commission's insertion of the word "party" into § 4-2 (b) (1) the sequence of events that ostensibly led to that revision. That sequence of events supports our conclusion that the court's interpretation

of the term "minority party member" as meaning a
member of a nonmajority political party represented
on the board of aldermen was proper. Therefore, we
conclude that the court did not improperly rely on its
*Booker I* interpretation of "minority party member" in
concluding that Braunstein was ineligible to serve as a
member of the inland wetlands and watercourses com-
mission.

D

Last, Braunstein claims that the court improperly
concluded that the "portion of § 4-2 (b) (1) dealing with
'minority party members' " was not unconstitutionally
vague. Specifically, he argues that "[p]rescribing the
process of appointing members of boards and commis-
sions . . . without providing a definition of 'majority'
and 'minority' as those terms are used in the charter
provisions, [denies] fair warning and [is] the epitome
of standardless enforcement." We disagree.

"The constitutional injunction that is commonly
referred to as the void for vagueness doctrine embodies
two central precepts: the right to fair warning of the
effect of a governing statute or regulation and the guar-
antee against standardless law enforcement. . . . If the
meaning of a statute can be fairly ascertained a statute
will not be void for vagueness since [m]any statutes
will have some inherent vagueness, for [i]n most English
words and phrases there lurk uncertainties. . . . For
statutes that do not implicate the especially sensitive
concerns embodied in the first amendment, we deter-
mine the constitutionality of a statute under attack for
vagueness by considering its applicability to the particu-
lar facts at issue." (Internal quotation marks omitted.)
*State* v. *Maurice M.*, 116 Conn. App. 1, 6–7, 975 A.2d
90, cert. granted on other grounds, 293 Conn. 926, 980
A.2d 913 (2009).

We read Braunstein's claim first to challenge § 4-2 (b) (1) as unconstitutionally vague as applied because it failed to give him adequate notice that his actions were prohibited by that provision. This argument is untenable. "The proper test for determining if a statute is vague as applied is whether a reasonable person would have anticipated that the statute would apply to his or her particular conduct. . . . The test is objectively applied to the *actor's conduct* and judged by a reasonable person's reading of the statute . . . . When we apply these principles to the facts of the present case, our fundamental inquiry is whether a person of ordinary intelligence would comprehend that the *defendant's acts were prohibited under the ordinance*." (Emphasis added; internal quotation marks omitted.) *State* v. *Skidd*, 104 Conn. App. 46, 57, 932 A.2d 416 (2007). Section 4-2 (b) (1) is a restriction on the mayor's appointment power; see footnote 6 of this opinion; and, therefore, is properly read as applying, in this case, to Jarjura's conduct and not Braunstein's conduct. As a result, his argument that the charter denied him fair warning has no merit.

Braunstein next challenges the charter as unconstitutionally vague because it lacks definitions for "majority" and "minority," and, as a result, he was the victim of arbitrary enforcement. Although the charter does not define the terms "majority" and "minority," "[t]he lack of an express definition does not, in and of itself, render a statute void for vagueness. . . . If a statute or regulation does not sufficiently define a term, it is appropriate to look to the common understanding of the term as expressed in a dictionary." (Internal quotation marks omitted.) *State* v. *Skidd*, supra, 104 Conn. App. 58. The American Heritage Dictionary defines a majority as "the greater number or part of something . . . [a] number more than half of the total number of a given group." American Heritage Dictionary (2d College Ed. 1982). It

defines minority as the "smaller in number of two groups forming a whole."[24] Id. In part II C of this opinion we concluded that the court's interpretation that "the meaning of the term 'minority party members,' as stated in § 4-2 (b) (1), refers to the nonmajority political parties represented on the board of aldermen" was correct. As a result, we conclude that the meaning of "minority party member" can be ascertained fairly and that the charter is not unconstitutionally vague. Moreover, we conclude that the restriction found in § 4-2 (b) (1) that "[n]o minority member of any such board shall be eligible to act as such unless his name shall be one of those listed by such minority leader in accordance with the provisions" was not arbitrarily enforced against Braunstein.

The judgment in AC 29940 and AC29941 is affirmed.

In this opinion the other judges concurred.

---

[24] We note that at all times relevant, the board of aldermen consisted of nine Democrats, four members of the Independent party and two Republicans. See footnote 15 of this opinion. Although the board consisted of three discrete groups in the form of political parties, this circumstance is not inconsistent with the definition of minority as the "smaller in number of *two* groups forming a whole" found in the American Heritage Dictionary (2d College Ed. 1982). This is evident in the court's definition of "minority party member" as, essentially, a member not in the majority. By that definition, a minority party member is a member of a group "smaller in number of two groups forming a whole," those groups being the majority and *nonmajority* members of the board of aldermen.